DAVID   SCHROEDER
May 31, 2022

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


CYNTHIA COSTANZO,            )
                            )
       Plaintiff,           )
                            )
   -vs-              ) No. 21 CV 1626
                            )
COSTCO WHOLESALE          )
CORPORATION,            )
                            )
       Defendant.         )
_____)


THE DEPOSITION OF
DAVID SCHROEDER
APPEARING REMOTELY FROM
COOK COUNTY, ILLINOIS
May 31st, 2022


REPORTED BY:
Linda A. Barger
CSR No. 084-0044442
APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

DAVID  SCHROEDER
May 31, 2022

Page 2

```
 1   APPEARANCES:
 2     NEMEROFF LAW OFFICES, LTD., By
       MR. ROBERT HIRSCH
 3     MR. DAVID NEMEROFF
       180 North LaSalle Street, Suite 3112
 4     Chicago, Illinois 60601
       (312) 629-8800
 5     juryman1@aol.com
 6
         On behalf of the Plaintiff;
 7
 8     BODELL BOVE, LLC., By
       MS. STACY D. FULCO
 9     2215 York Road, Suite 515
       Oak Brook, Illinois 60523
10     (630) 382-4800
       sfulco@bodellbove.com
11
12       On behalf of the Defendant.
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1          INDEX
 2
     WITNESS              EXAMINATION
 3
     DAVID SCHROEDER
 4
       By Ms. Fulco           4, 145
 5     By Mr. Nemeroff          131
 6
 7
          EXHIBITS
 8
 9   DEPOSITION EXHIBIT      FIRST REFERENCED
10     Schroeder No. 1           5
       Schroeder No. 2           8
11     Schroeder No. 3          15
       Schroeder No. 4          19
12     Schroeder No. 5          20
       Schroeder No. 6          21
13     Schroeder No. 7          22
       Schroeder No. 8          24
14     Schroeder No. 9          28
       Schroeder No. 10         36
15     Schroeder No. 11         41
       Schroeder No. 12         54
16     Schroeder No. 13         63
       Schroeder No. 14         63
17
18
19
20
21
22
23
24
```

Page 4

```
 1            (Witness duly sworn.)
 2        MS. FULCO: Let the record reflect this is
 3   the deposition of David Schroeder taken pursuant to
 4   notice and all applicable Federal Rules of the
 5   evidence and rules of the Northern District of
 6   Illinois.
 7            DAVID SCHROEDER,
 8   called as a witness herein, having been first duly
 9   sworn, was examined and testified as follows:
10            EXAMINATION
11   BY MS. FULCO:
12     Q.  Could you please state your full name for us
13   and spell your last name for the record.
14     A.  Sure.  It's David John Schroeder,
15   S-C-H-R-O-E-D-E-R.
16     Q.  Okay, great.  I assume have you have given
17   depositions before?
18     A.  I have.
19     Q.  Okay.  So if there is any questions you don't
20   understand, please let me know.  Don't answer because
21   if you answer, we'll assume you understood the
22   question.  If you have any technical difficulties and
23   you need a question repeated, let us know and that can
24   be done, repeated for you, read back for you, either
```

Page 5

```
 1   myself or the court reporter.
 2        I assume Robert has your contact information
 3   and you can contact him if you have any technical
 4   difficulties that way as well.  If you need to take a
 5   break, let us know we can do that as long as a
 6   question is not pending, okay?
 7     A.  Okay.
 8     Q.  All right.  Now, I'm going to – give me one
 9   second here.  So let me show you what I have marked as
10   this is Schroeder Deposition Number 1, and this is a
11   copy of your deposition notice and rider.
12        Have you ever seen this?  I can go through
13   it.
14     A.  I don't know if I have seen the rider.  I
15   received the –
16     Q.  So there is the rider.  Have you ever seen
17   it?
18     A.  Not that I recall.
19     Q.  Have you seen the notice?
20     A.  The notice?  I received – the last thing I
21   saw was just the link to this, because I don't believe
22   I saw this.
23     Q.  Do you know if all of the information as
24   documents requested in the rider have been provided?
```

DAVID SCHROEDER
May 31, 2022

Page 6

1    A. I have not seen the copies, but I would
2  expect that Nemeroff Law Offices received almost all
3  of these things. I do not keep deposition
4  transcripts. I think had a conversation on the phone
5  and said I don't keep deposition transcripts. I did
6  have a phone call but I haven't seen this.
7    Q. Okay. Do you know if you provided Counsel
8  with anything -- did you provide Counsel with anything
9  to respond specifically to this rider, to your
10  knowledge?
11    A. Did I provide them with -- I just discussed
12  whether or not I kept these items or not.
13    MR. HIRSCH: I apologize, Stacy, can we take
14  maybe a two-minute break? David's trying to sign on
15  to the Zoom?
16    MS. FULCO: We just can't continue and then
17  he can't get on while we're talking?
18    MR. HIRSCH: He just walked in and asked me
19  to take a two-minute break so he can hit the Zoom
20  link, I apologize.
21    MR. FULCO: That's fine.
22        (Whereupon, a break was taken,
23        after which the following
24        proceedings were had:)

Page 7

1        (Whereupon, Mr. David Nemeroff
2        entered the Zoom proceeding.)
3    MS. FULCO: So I just want to make sure who
4  is going to be handling -- I don't want two
5  plaintiff's counsels.
6    MR. NEMEROFF: They will be one at a time.
7  Robert is going to sign off. He's doing something
8  else. I'm going to be on and when I have to leave,
9  Robert is going to come back on.
10    MR. FULCO: Okay.
11  BY MS. FULCO:
12    Q. So do you know if you specifically provided
13  any materials relating to the rider?
14    A. You know, if we go through the rider bullet
15  point by bullet point, I can discuss and say the same
16  things I told Mr. Nemeroff on the phone about them. I
17  just don't remember because I don't have a copy of it.
18  I don't remember what each item on -- item four on
19  that rider says.
20    Q. When were you first contacted by plaintiff's
21  Counsel's office to review anything relating to this
22  matter?
23    A. I saw a photograph of this. I don't remember
24  back in 2021, I believe it was in May. It was just a

Page 8

1  photo of the scene and it was literally -- I don't
2  remember having a conversation about it.
3    Q. And so is that when you were first retained?
4    A. I don't think I sent an official retainer
5  agreement to Mr. Nemeroff. We have worked in the past
6  so I didn't send him that specific agreement. And the
7  first real work that I ever really did in this case
8  started in March of this year.
9    Q. So when you were first contacted it was an
10  e-mail from Counsel to you, you said?
11    A. Yeah.
12    Q. Okay.
13    A. I think it literally had a picture of a
14  sidewalk -- or, I'm sorry, the parking lot and the
15  asphalt with concrete gutter next to it.
16    Q. So I'm going to show you what is marked as
17  Schroeder Dep Exhibit Number 2. This is some
18  documents I was provided. I am just going to go
19  through these quickly. I want you to see if this is
20  all the written discovery between you and Counsel,
21  Counsel for plaintiff?
22    A. Sure. Okay, slow down.
23    Q. Do you want me to go backwards?
24    A. No, we are good. Keep going. So far so

Page 9

1  good.
2    Q. And that is it?
3    A. Yeah, that's it.
4    Q. Are there any other letters or texts or other
5  e-mails not included here between you and Counsel's
6  office?
7    A. No, we switched our bookkeeping software
8  recently and we may have sent him an e-mail that shows
9  invoices, but I don't know if we did or not. I don't
10  know if it was an e-mail or it was sent via the Post
11  Office because it's through our new bookkeeping
12  program, but I don't know if this predates it or not.
13    Q. Now, looking at what is marked as -- I Bates
14  stamped these on the bottom. So 001, this is a
15  May 27, 2021 e-mail and Counsel e-mailed you photos
16  but there was nothing said in the e-mail, correct?
17    A. That's right.
18    Q. And is this the e-mail you were referring to
19  earlier?
20    A. Yeah, I think we were on the phone. I just
21  said, hey, I've got another case I just want to send
22  you a picture. It was while we're on the phone or
23  something. I took a look at the picture and said, oh,
24  yeah, that doesn't look so good. That was the extent

DAVID SCHROEDER
May 31, 2022

Page 10

1  of our conversation and then I didn't hear from
2  Mr. Nemeroff for approximately almost a year about
3  this case.
4      Q. And were you given any other materials or
5  documents relating to this case before this e-mail was
6  sent to you?
7      A. No.
8      Q. Did you have a phone call other than the
9  phone call you just mentioned to me, did you have any
10  other phone calls or in-person discussions with
11  someone about this case before this e-mail was sent?
12      A. No.
13      Q. What information was given to you about the
14  case before the e-mail was sent?
15      A. I don't really remember if there was anything
16  given to me before the e-mail was sent. I just recall
17  looking at the photograph while on the phone and
18  saying, yeah, that doesn't look good. Doesn't look
19  like a safe parking lot transition between the asphalt
20  and the concrete gutter.
21      Q. Well, I'm asking what information was
22  provided to you? Was that information provided to
23  you?
24      A. Was what information provided to me?

Page 11

1      Q. What I just said. My question was: What
2  information was provided to you before the photograph,
3  not what you commented to him. So what you just told
4  me, is that what he told you?
5      A. No.
6      Q. Okay.
7      A. He told me that a client fell on the
8  transition between the asphalt and the concrete
9  gutter, that was it. I said, well, that doesn't look
10  real safe.
11      Q. All I was asking is what information you were
12  given. Okay.
13          Now, looking at page two of Exhibit 2, this
14  is an e-mail from plaintiff's counsel regarding the
15  case with materials attached, correct?
16      A. That's right.
17      Q. And this is ten months since the first
18  e-mail. Were there any type of communications or
19  correspondence between you and plaintiff's counsel or
20  his office about this case during those ten months?
21      A. No, I had forgotten all about the photograph,
22  to be honest. Until I saw this again, I didn't even
23  remember.
24      Q. This e-mail gives a summary of the case

Page 12

1  information; is that correct?
2      A. That's correct.
3      Q. Was this the first time you were given
4  detailed information about the case in writing?
5      A. Yes.
6      Q. According to the e-mail, Counsel told you the
7  cause of the fall was a height differentiation between
8  asphalt and concrete, correct?
9      A. That's correct.
10      Q. According to the e-mail, Counsel told you
11  that according to the plaintiff, the height
12  differential was 1 and 3/4 inches, correct?
13      A. That's correct.
14      Q. Did Counsel tell you how that height
15  differential was determined at that point?
16      A. Yes.
17      Q. Did can't tell you when that height
18  differential was determined at that point?
19      A. Yes. If you look at bullet point three, the
20  measurement was taken one month after the date of the
21  accident, according to the e-mail here.
22      Q. When you got this e-mail, what was your
23  understanding as to how that height differential was
24  measured?

Page 13

1      A. My understanding is that the – I believe
2  its the husband of the plaintiff, they marked the
3  heel of his boot based on where the asphalt hit and
4  they measured that distance.
5      Q. And that information was provided to you in
6  this e-mail?
7      A. It was discussed on the phone.
8      Q. Was that discussion before or after this
9  e-mail was sent?
10      A. After.
11      Q. Do you know when?
12      A. No.
13      Q. Okay. So in the e-mail Counsel did not
14  indicate how the measurement was taken, correct?
15      A. That's correct.
16      Q. Did Counsel – in this e-mail did Counsel
17  give you any information about specifically where that
18  height differential was obtained?
19      A. In that e-mail, no.
20      Q. At some point around when he received the
21  e-mail, did Counsel give you information?
22      A. I don't recall exactly when Counsel said that
23  the plaintiff went to where she thought she fell and
24  measured the height differential of that location.

DAVID SCHROEDER
May 31, 2022

Page 14

1    Q.   And then Counsel listed materials he was
2    giving you as well, correct?
3    A.   That's correct.
4    Q.   Now, looking at page four of Exhibit 2, this
5    is a February -- well, actually, I don't know that we
6    said the date.  The date you got that e-mail that we
7    just looked at on page two with all of that, the
8    assignment, the information and the documents was
9    March 28, 2022, correct?
10   A.   Correct.
11   Q.   And then the next correspondence we have here
12   on page four is April 26, 2022, with Counsel e-mailing
13   you some more materials, correct?
14   A.   That's correct.
15   Q.   All right.  It looks like he got you some of
16   the materials with some more photographs, correct?
17   A.   That's right.
18   Q.   Did Counsel tell you where those photographs
19   came from or when they were taken, these new ones?
20   A.   He did tell me that the photos from the
21   Defendant, which has -- the ones that are labelled
22   that, that those were taken on the day of the accident
23   that you can see the -- I believe it's the Plaintiff
24   being led to a stretcher in one of those photographs.

Page 15

1    Or it says photos from defendant dot PDF.  And then
2    the other photographs that were the ones that had the
3    dot plaintiff at the end, from my understanding, those
4    were the photographs taken approximately one month
5    after the accident took place.
6    Q.   And when did Counsel give you this
7    information?  Was this on the phone?
8    A.   Yeah, I don't remember when if it was a
9    follow up from the e-mail or if it took place a couple
10   of days later.  I just don't really remember.
11   Q.   And Counsel said he was going to be -- I
12   think it was based back in March 28, 2022 e-mail
13   Counsel said he was going to provide you with an
14   affidavit from his client, correct?
15   A.   Yes.
16   Q.   Okay.  And then in this e-mail
17   April 26, 2022, Counsel said he was attaching the
18   signed statement from his client, correct?
19   A.   Yes.
20   Q.   Okay.  Now, let me show you what I have
21   marked as Schroeder Dep Exhibit Number 3.  And I just
22   want to place an objection on the record to this
23   document as it was not previously produced, it's not
24   admissible, and it's not a proper affidavit or sworn

Page 16

1    statement.
2        So Exhibit Number 3 at top says statement of
3    Cynthia Costanzo.  Is this the signed statement
4    Counsel sent to you?
5    A.   Yes.
6    Q.   Do you know if that is the signature of
7    Cynthia Costanzo at the bottom?
8    A.   No, I don't know that one way or the other.
9    Q.   Do you know when this document was prepared?
10   A.   No.
11   Q.   Do you know when this document was signed?
12   A.   Nope.
13   Q.   Do you know who prepared this document?
14   A.   No.
15   Q.   Now, looking back at Exhibit 2 real quick, on
16   page two in that March 28, 2022 e-mail, Counsel said
17   he'd be providing you with an affidavit from
18   Ms. Costanzo, correct?
19   A.   Correct.
20   Q.   Now, Exhibit 3, looking at that again,
21   Exhibit 3 is not an affidavit, true?
22   A.   It doesn't say affidavit on the top, but I
23   don't know the legal distinctions.
24   Q.   It's not notarized, true?

Page 17

1    A.   True.
2    Q.   Have you ever received an affidavit from the
3    plaintiff in this case?
4    A.   No.
5    Q.   Is this the only type of written statement
6    you have received from the plaintiff?
7    A.   Yes.
8    Q.   Have you ever received the sworn deposition
9    testimony from the plaintiff about this incident?
10   A.   No.
11   Q.   Did you ever ask to review her sworn
12   testimony?
13   A.   No.
14   Q.   Were you given any other documents or
15   information about how the fall occurred other than
16   this document, Exhibit 3?
17   A.   No.
18   Q.   When you reviewed --
19   A.   Well, actually, I'm sorry, there is -- in
20   addition to that document, there is also an incident
21   report that was provided to me as well.
22   Q.   When you reviewed this case and prepared your
23   report, did you assume the information in this
24   document, Exhibit 3, was true and accurate?

DAVID   SCHROEDER
May 31, 2022

Page 18

1    A. Yes, I relied upon that as well as the other
2    items I was sent.
3    Q. What was your basis to assume the information
4    in this document was true and accurate?
5    A. What was the basis for assuming it was true
6    and accurate? I just assumed that it was true and
7    accurate. The basis was on documents sent by the
8    attorney's office that represented his client. If it
9    wasn't true and accurate it would probably cause him
10   trouble.
11   Q. Now, going back to Exhibit 2, page five, this
12   is an April 29, 2022 e-mail from you to plaintiff's
13   counsel and there is just a bunch of attachments,
14   correct?
15   A. Yeah.
16   Q. Did you have a discussion with Counsel before
17   you e-mailed these documents to him?
18   A. Did I have a discussion about it? I had --
19   no. I had sent a report and then I followed up with
20   the supporting documents that were referenced in my
21   report -- at least I think so. I may have it
22   backwards.
23      I know that I was sending e-mails about what
24   I'm referencing in my report. I just don't remember

Page 19

1    if I sent the report first or the e-mails first. I
2    just don't remember.
3    Q. Did you have a discussion with Counsel about
4    the documents, the report, the attachments either
5    before or after they were sent via e-mail?
6    A. I had a discussion on the phone what my
7    report said.
8    Q. Before or after it was sent?
9    A. I can't recall.
10   Q. Now, looking at Schroeder Exhibit Deposition
11   Exhibit Number 4, this Exhibit contains all of those
12   documents you sent to Counsel on April 29, 2022 in
13   that e-mail. Other than your rate schedule, I want
14   you to confirm if that is true, so I'll go through
15   this.
16   A. That looks right.
17   Q. Now, going back to Exhibit 2, if it will let
18   me, page six is an April 29, 2022 e-mail from you to
19   Counsel and that provides your report and your case
20   list, correct?
21   A. That's right, yep.
22   Q. And that is the same day as the prior e-mail
23   but a little later in the day when you sent your
24   report and your case list, correct?

Page 20

1    A. That's right.
2    Q. Now, Exhibit 5, Schroeder Dep Exhibit
3    Number 5, this is your April 28, 2022 report. Go
4    through that. That was sent to Counsel that day,
5    correct?
6    A. Yeah, that looks correct, yep.
7    Q. And this is the report you referred to in
8    that April 29, 2022 e-mail to Counsel, correct?
9    A. The one that says that there is a report
10   attached, yeah.
11   Q. Did you prepare this report yourself?
12   A. Yes.
13   Q. Is that your signature at the bottom of the
14   report?
15   A. Yes.
16   Q. Did you ever show Counsel any prior drafts of
17   the report either in person or over Zoom or some other
18   format prior to you sending it to him or e-mailing it
19   to him?
20   A. No, not that I recall, no.
21   Q. Now, going back to Exhibit 2 onto page seven,
22   this is an April 29, 2022 e-mail from you to Counsel
23   with your CV and rate schedule. So this is just the
24   third e-mail to him on that date with more documents,

Page 21

1    correct?
2    A. Yeah, that's right.
3    Q. And then page eight of Exhibit 2 is a
4    May 4, 2022 e-mail from you to Counsel with your W-9
5    so that was sent a few days later, correct?
6    A. That's right, yeah. He had asked for it, I
7    believe, on the phone, and I just omitted it in
8    signing it when I was sending all of the other stuff.
9    There is a lot of documents that I sent.
10   Q. Now, looking at Schroeder Dep Exhibit
11   Number 6, is this your rate schedule for this case?
12   A. Yes.
13   Q. And the second page of this, is this for this
14   case or for some other case?
15   A. Basically I did not create a proposal for
16   this case, and I was asked to provide an hourly rate
17   schedule, so I grabbed another recent proposal and
18   sent it to him without making modifications to it. I
19   think I may have added modified 2022 hourly rate
20   schedule on the top that I should have erased at the
21   bottom of it.
22   Q. Do you have a rate schedule for this case
23   that is signed by Counsel?
24   A. No, I do not.

DAVID  SCHROEDER
May 31, 2022

Page 22

1    Q.  Let me pull up Exhibit 7, Schroeder
2    Deposition Exhibit Number 7.  Is this the only invoice
3    you have generated to date for this case?
4    A.  Yes.
5    Q.  And the date of the invoice is May 17, 2022,
6    correct?
7    A.  That's right.
8    Q.  How was this invoice provided to Counsel?
9    A.  How was it provided to Counsel?  This is
10   clearly the new invoice program that I mentioned
11   before.  And the program, I believe, it would be
12   e-mailed to the Counsel but it's weird, it doesn't
13   have a record of e-mails like my regular e-mail
14   program.  It just goes directly through the software.
15   Q.  So would there be – would this be an
16   attachment to an e-mail?
17   A.  You know, I'm not familiar enough with this
18   software to know if it's an attachment to the e-mail
19   or it's the e-mail itself.  I'm just – I have
20   literally used it twice with this program.
21   Q.  If there is an attachment to the e-mail, we'd
22   like it produced because we were not provided e-mails
23   of this being sent.
24   So how many e-mails, letters or other forms

Page 23

1    of written communication have you had with Counsel?
2    MR. NEMEROFF:  By the way, Stacy –
3    MS. FULCO:  Excuse me.  I'm in the middle –
4    MR. NEMEROFF:  I know that but you made a
5    request.  I was on mute.  I just got off mute.  It
6    comes in as just an invoice and so we printed out the
7    invoice and sent it to you in the form that was sent
8    to us.  There is no other attachment.
9    MS. FULCO:  Thank you.
10   BY MS. FULCO:
11   Q.  How many e-mails, letters or other forms of
12   written communication have you had with Counsel since
13   the May 4, 2022 e-mail, which is the last one I have?
14   A.  Since May 24?
15   Q.  May 4, 2022?
16   A.  May 4, 2022?  I have one on May 26th, which
17   is a link to this thing that we are doing right now
18   and then – oh, I have – I found the e-mail.  It
19   says – the e-mail says, invoice 3698 from David
20   Schroeder Architects, Ltd., and it goes to David
21   Nemeroff.  And then it has some boilerplate.  It says,
22   Dear David, please find the attached document.  Have a
23   great day.
24   Q.  Any other communications of any kind –

Page 24

1    letter, e-mail, other forms of written communication?
2    A.  No.
3    Q.  Okay.  So let me show you what I have marked
4    as Schroeder Deposition Exhibit Number 8.  I believe
5    these are – this was one of the sections of materials
6    provided to us pursuant to the rider, and I believe
7    there are all the vast majority of the photographs you
8    were given to review from Counsel.  I'm just going to
9    go through so you see what I'm referring to in this
10   exhibit.  So is this the exact same format the photos
11   were provided to you in?
12   A.  Are those the same format?  I did get some
13   jpegs and I also was given four of these – hold on
14   one second.  I think they may be PDFs as well.  Hold
15   on one second.  I'm trying take a look at that right
16   now.  I got some JPEGs and I also got some PDFs and it
17   appears that they are the same photographs, just in
18   different format.
19   Q.  So what photos did you get that were actually
20   JPEG, so they were color and –
21   A.  Well, all of them were color.  All of them I
22   received was color.
23   Q.  So this is not showing – this is not knowing
24   us, at all, the version you were given because

Page 25

1    everything I have is black and white.
2    A.  Yes, it's the same views, but it's not the
3    same photos.  These look like they are black and
4    white.  It looks like this –
5    MR. NEMEROFF:  Just for the record,
6    everything is in color but they were printed out and
7    submitted as part of our disclosure in black and
8    white –
9    MR. FULCO:  That's fine, David, but I'd
10   prefer to ask the witness.
11   MR. NEMEROFF:  That's fine.  I'm the one that
12   provided everything so I'm the one that has the most
13   knowledge of these photographs.  There is no black and
14   white photograph.  As you know, you have every one of
15   these photographs.  Those were disclosed in our
16   discovery throughout the –
17   MR. FULCO:  Again –
18   MR. NEMEROFF:  No –
19   MS. FULCO:  – objections.  I am asking the
20   witness –
21   MR. NEMEROFF:  NO, let me finish –
22   MR. FULCO:  I'm asking the witness what he's
23   seen.
24   MR. NEMEROFF:  Right.  That's why –

DAVID SCHROEDER
May 31, 2022

Page 26

1  MS. FULCO: David, I know what the originals
2  look like. That doesn't mean what he has seen. I'm
3  asking him, not you.
4      MR. NEMEROFF: Right, he's already told you
5  he's seen color –
6      MR. FULCO: Can you please not speak for the
7  witness –
8      MR. NEMEROFF: No, can you please stop being
9  rude and when I have an objection or something to say,
10  stop being rude. You have been doing that throughout
11  the entire case. I'm going to ask you to stop being
12  rude to me. I have a right to speak and say things
13  during this deposition, okay?
14      MR. FULCO: You do not have a right to offer
15  improper objections. And I'm only asking for you to
16  please offer proper objections and not speaking
17  objections.
18  BY MS. FULCO:
19      Q. So Mr. Schroeder, can you please confirm –
20  so that is why I was asking if that is the same format
21  so, number one, all of the photographs you saw you
22  actually saw color versions of the photographs; is
23  that correct?
24      A. Yeah, I received the actual PDF files. This

Page 27

1  appears to be a printout of PDF. It looks like
2  something that was printed from an e-mail or something
3  and passed along as opposed to the electronic file
4  which doesn't have a format other than, you know,
5  pixels on a screen. So it's the same photographs but
6  what you have – what you're showing me looks like a
7  printout.
8      Q. Okay. And so which photographs – well, I
9  guess if we go here, we can see that – if we are on
10  the first page it says JPG – dot JPG, so you got this
11  one in a JPEG form?
12      A. That's correct. I can go through a list of
13  all of the names of these photographs, if you'd like
14  me to go through it, so we can save some time.
15      Q. Sure. Why don't you list the ones you got in
16  JPEG form?
17      A. Also just so you know, all the photos I
18  received, many of them I got duplicates that are in
19  PDF format so, once again, you can see it in color but
20  it is not necessarily the original JPEG. So I
21  received photo underscore one dot JPG. I got photo
22  underscore 2 dot JPEG. Photo underscore 3 dot JPG.
23  Photo underscore four, dot PNG, which are all files
24  that you can see the color and see the individual

Page 28

1  pixels if you want to zoom in close enough.
2      Q. Okay, thank you. So now I'm going to show
3  you Schroeder Deposition Exhibit Number 9. This is
4  the case list that was provided to me. I'll just show
5  you. It's about two-and-a-half pages. Is this
6  complete and up to date?
7      A. I believe so. This is a case list that goes
8  back, I believe, four years and I prepared it for
9  another case that was Federal relatively recently, so
10  it may be slightly more than four years back.
11      Q. That was my next question. So as to how far
12  back it goes. So it goes four years or potentially a
13  little longer?
14      A. Yeah. My understanding when I saw the
15  Federal Rules or the attorney who hired me said that
16  the Federal Rules required me to have a case list
17  including the case number and the county going back
18  four years, and it would only include those that I was
19  deposed or I testified at trial.
20      Q. When did you start providing expert testimony
21  in legal cases?
22      A. Much earlier like 10, 11, 12 years ago,
23  something like that.
24      Q. Any of these cases on this form, Exhibit 9,

Page 29

1  were you the expert for the defendant?
2      A. No.
3      Q. Have you ever been retained and offered
4  expert opinions on behalf of a defendant?
5      A. Yeah.
6      Q. But the last time was over four years ago?
7      A. That's right.
8      Q. So how many –
9      A. Hold on one second. I think it was sooner
10  than that. I don't want to miss – get it wrong for
11  the record. I was hired, but I don't believe I was –
12  I don't believe I had any testimony that the last time
13  I worked for a defense – actually neither in the ones
14  I remember I didn't actually testify, but I did write
15  reports.
16      Q. So in your years of being an expert witness,
17  the last 10 to 12 years, how many times have you been
18  retained by a defendant?
19      A. I think three or four times.
20      Q. Have you offered expert deposition testimony
21  in any of those cases?
22      A. No, they settled beforehand or before that
23  took place.
24      Q. Did you do a report in all of them?

DAVID  SCHROEDER
May 31, 2022

Page 30

1    A. No.
2    Q. How many did you do reports in?
3    A. I remember at least – I remember two for
4  sure, probably three, and then there was one where I
5  spent a lot of time discussing the issue with the
6  attorney, but I didn't actually write a report.
7    Q. And over those 10 to 12 years, what is your
8  best estimate as to how many cases you have handled
9  for plaintiffs?
10    A. Probably 200 plus.
11    Q. Now, looking at – I'm going to enlarge this
12  a little bit so you can see what I'm talking about.
13  If we look, there's three cases here listed for the
14  Costello Firm. The address of the accident is not
15  provided; do you know why not?
16    A. Yes, I hadn't been deposed. I still have not
17  been deposed on that. I put it in as a place marker.
18  I wanted to make sure when I was deposed I would put
19  it in there so.
20    Q. But you know the address of the accident for
21  that one, correct?
22    A. Not off the top of my head. I just put it in
23  there. I didn't put it in there because I didn't have
24  it in front of me. I was just putting it in there so

Page 31

1  I didn't forget. And then as soon as I'm deposed,
2  I'll look up the address and fill it in. I just don't
3  remember where it is exactly. Georgio's Banquets
4  wherever that is.
5    Q. I'm sorry?
6    A. Georgio's Banquets wherever that address is.
7  I don't know that off the top of my head.
8    Q. Are any of these cases that involve a trip
9  and fall that you have done that are listed in this
10  exhibit allegedly due to a height difference between
11  two ground surfaces outside?
12    A. Let me go through because I can't remember
13  off the – I don't have an encyclopedic knowledge of
14  these things. Let's see. No, none of them are
15  related to – all related to a non-level walking
16  surface.
17    Q. And can you think of any cases you were
18  involved in prior to other than being on this list
19  that involved a trip and fall on a height difference
20  between two ground surfaces that were outside?
21    A. Yeah, I think I recall testifying in some
22  trial with a mail person who tripped on a height
23  differential in an exterior public sidewalk.
24    Q. Do you know where that took place?

Page 32

1    A. No.
2    Q. So do you recall handling any cases like that
3  other than that one?
4    A. Yeah, there was another one years and years
5  ago where there was a big differential settlement on
6  the sidewalk and somebody was riding a bike and hit it
7  and flew over their handlebars.
8    Q. And you said that one settled?
9    A. I don't – I really don't. This is years
10  ago. I don't remember. I don't know the outcome of
11  this case. A lot of time I don't know about it until
12  never.
13    Q. Sorry, I thought you said settlement
14  specifically. So do you know any other cases that
15  have like that factual scenario other than those two?
16    A. That are outdoors?
17    Q. Correct.
18    A. Yeah, there was another case years ago where
19  I think a tree caused a differential settlement, the
20  tree roots lifted up the sidewalk and somebody fell as
21  they were entering the restaurant, I believe.
22    Q. Okay. So in your years you can think of
23  three cases where you have handled that type of
24  scenario?

Page 33

1    A. That it is outside, yeah.
2    Q. Did you work for the plaintiff in all of
3  those cases?
4    A. Yeah.
5    Q. Have you ever been retained by Costco or any
6  attorney for Costco?
7    A. No.
8    Q. Have you ever been retained in a case – any
9  case involving Costco prior to this case?
10    A. No.
11    Q. Is there any law firm you have handled for
12  cases for other than Nemeroff Law Offices?
13    A. Zneimer & Zneimer. I have done quite a few
14  cases for those guys.
15    Q. Who is it?
16    A. Zneimer & Zneimer.
17    Q. Could you spell that?
18    A. Sure, Z-N-E-I-M-E-R.
19    Q. So how many have you done for them?
20    A. Probably somewhere around ten by now.
21    Q. And how many in total have you done for
22  Nemeroff Law Offices?
23    A. About 10, 15, somewhere in there.
24    Q. So is there any law firm you have handled

DAVID SCHROEDER
May 31, 2022

Page 34

1  more cases for other than Nemeroff Law Offices?

2    A. Yes, I used to do a lot of work for what are

3  they called? Yeah, I did a lot of work for one firm

4  for years and then they split up and I just got hired

5  to do another case for them.

6    Q. And it would have been more than 10 to 15

7  cases?

8    A. Yeah, I'm drawing a blank. I really

9  shouldn't, but I'm drawing a blank. I'm sure it will

10  come to me in just a moment.

11    Q. When you work on a case for Nemeroff Law

12  Offices do you always work with David Nemeroff?

13    A. Yeah, I think I have always spoken with

14  David, but there have been cases where it might have

15  just been a few sentences about the case and then I

16  have worked with other attorneys.

17    Q. How did you meet him initially?

18    A. I don't know how I met David initially. I

19  seem to get referred from one attorney to another so

20  he must have found me through a referral. I don't

21  advertise or anything.

22    Q. Do you know him socially in any way?

23    A. No.

24    Q. Other than these eight cases you listed with

Page 35

1  Nemeroff Law Firm on this exhibit, have you ever been

2  sent -- you said you have said you have been sent

3  other cases to review by his firm, correct?

4    A. Yes, those predate these ones from the past

5  four years. As I expected, I remembered the other

6  attorney's firm we've done a ton of cases for. It's

7  Harmon & Fedick. Tom Fedick was the attorney I have

8  done a lot of work with. His firm has undergone quite

9  a few changes over the last few years.

10    Q. Going back to the cases with Mr. Nemeroff's

11  firm, have you testified in the cases that were before

12  those listed on this Exhibit 9, did you testify in any

13  of those?

14    A. As in a trial?

15    Q. Either?

16    A. Either? Yeah, I believe so.

17    Q. And would you have done a report in those

18  cases as well -- some of them at least?

19    A. Probably, yep.

20    Q. Now, looking at Exhibit 9 and the cases where

21  you have worked with Mr. Nemeroff, I'm going to say

22  the name wrong but Petchiote (phonetic) versus Pryor

23  and Pryor versus Village of Lake Villa. What was the

24  cause of the fall on the sidewalk?

Page 36

1    A. Ice.

2    Q. And then the Velasquez versus Village Green

3  Holding. What was the cause of the fall in the

4  parking lot?

5    A. Ice.

6    Q. And then under Kevin O'Connor, these couple

7  of cases, Peterson versus M-H-M-G, what was the cause

8  of the fall in the parking lot?

9    A. Ice.

10    Q. Under Tomasik down here -- Daley versus

11  Ritter, what was the cause of the fall in the parking

12  lot?

13    A. Ice.

14    Q. And then under Randall Wolf, the case Klein

15  versus Carlisle, what was the cause of the fall in the

16  parking lot?

17    A. Ice.

18    Q. Now, going to Exhibit 10, Schroeder

19  deposition Exhibit 10, this is a copy of your CV that

20  I was provided. Is this complete and fully up to

21  date?

22    A. No.

23    Q. Do you have one that is more recent?

24    A. Yeah, but I just made it recently. I have

Page 37

1  the wrong address on that.

2    Q. Okay. So is there anything other than the

3  address that needs to be updated?

4    A. If you scroll through, I'd be able to tell

5  you if there is anything else there.

6    Q. So we'll just ask if the most recent one can

7  please be provided?

8    A. Sure. It's likely that I have updated the

9  secretary projects to indicate that some of these

10  projects are actually complete now, so I may have

11  updated the project section when I put in the correct

12  date.

13    Q. Okay. Now, do you have any professional

14  licenses or certifications?

15    A. I'm a licensed architect.

16    Q. Anything else?

17    A. Certifications? I don't know what you mean

18  by that but there is City of Chicago offers

19  certifications if you take classes and pay money so

20  I'm a self-certified architect with a certification in

21  the Chicago Energy -- Registered Energy Professional.

22    Q. Do you have any legal education or training?

23    A. No.

24    Q. What percentage of your time is working as an

DAVID   SCHROEDER
May 31, 2022

Page 38

1   architect compared to working on legal cases?
2       A.  It varies week to week but it's –
3       Q.  I'm talking about let's say year to year
4   then?
5       A.  Year to year?  It also varies year to year.
6   It's both aspects of my job are – there is not a lot
7   of control over.  I have been about where and when I
8   get the work.  So it is typically around 50 to
9   60 percent legal versus architecture, but that can
10  vary tremendously from year to year.
11      Q.  Let's talk about 2021.  What was your best
12  estimate as to what it was legal versus architecture?
13      A.  I can look that up.  From my – I ask that
14  question of my bookkeeper.  Let's see if I can –
15  okay, gross income was about 56 percent in 2021.
16      Q.  From legal?
17      A.  Yep.
18      Q.  How about 2020?
19      A.  I think it was more 65 percent.
20      Q.  So 65 percent gross income from legal in
21  2020?
22      A.  Yeah, that was when the Pandemic was really
23  going.
24      Q.  How about 2019?

Page 39

1       A.  About 56 percent.
2       Q.  2018?
3       A.  56 percent.
4       Q.  2017?
5       A.  I don't know.
6       Q.  And do you know any time before that?
7       A.  No.
8       Q.  And so the numbers you just gave me was like
9   really your income?
10      A.  Yep.
11      Q.  Okay.  What about what I'm talking about
12  then, like let's say last year out of your time, not
13  your income, but what is your best estimate as to how
14  much of your time is spent handling legal cases versus
15  architectural work in 2021?
16      A.  Yeah, last year was about 30 percent legal
17  work, 70 percent architectural work.
18      Q.  So far this year what has it been for your
19  time?
20      A.  Approximately the same.
21      Q.  And then?
22      A.  Actually probably more – yeah, it's about
23  the same.  About the same.
24      Q.  In 2020 what is your best estimate as to how

Page 40

1   much of your time, working time, was spent handling
2   legal cases compared to architecture?
3       A.  I thought you already asked that question for
4   2020.
5       Q.  No, I said 2021?
6       A.  I really wouldn't know.  I'd have to go back
7   and check time sheets.  I really don't know that far
8   back.
9       Q.  Has any Court ever barred you from testifying
10  as an expert in a legal case?
11      A.  I don't know if what that term means from a
12  legal perspective.  There have been a couple times
13  when I have not testified in the case and I'm not
14  exactly sure why.  I don't know if it's – I heard –
15  I know what the reason was for one of them, but I
16  don't know the other one.
17      Q.  What was the reason for one?
18      A.  It was a case where some kid had the top of
19  her foot shaved off upon entry into a strip mall and
20  there – apparently there was some discussion about
21  which – whether or not the landlord or the tenant who
22  rented from the landlord was responsible for the door
23  and then the judge said that the people being sued
24  were not responsible for the door that was at issue,

Page 41

1   so I didn't testify in that one.
2       Q.  Has an attorney ever told you that a judge is
3   not allowing you to testify?
4       A.  Yeah, there was one I was not allowed to
5   testify.
6       Q.  What case was that?
7       A.  That was a case it was a sidewalk in the City
8   of Chicago where tree roots had moved the sidewalk and
9   the judge said something to the effect that it had
10  taken too long, that this change in sidewalk level was
11  long had taken too long from the trees – I don't
12  know.  It made no sense to me.
13      Q.  Is that case listed on your case list?
14      A.  No, it's prior to that.
15      Q.  Now, I'm showing you what is marked as
16  Schroeder Deposition Exhibit 11.  This is a page from
17  your website, correct?
18      A.  Yeah.
19      Q.  Did you author this page?
20      A.  I believe so, yes.
21      Q.  When you note your consulting services
22  include that list of items, what does that mean, that
23  you consult on those items?
24      A.  I have been asked to render opinions about

DAVID SCHROEDER
May 31, 2022

Page 42

1    these various items in testimony or help clients with
2    these problems like water infiltration, where it's not
3    necessarily an immediate architecture project that one
4    would typically hire an architect for, that's it.
5        Q.  Do you assert to be an expert in the area of
6    all of those topics you listed there?
7        A.  Yes, for the most part, although my
8    understanding just recently from another deposition
9    testimony and attorney asking me questions is that
10   there is huge legal distinction from natural versus
11   unnatural accumulation of snow and ice.  I have
12   testified about what would be called, as an architect,
13   natural versus unnatural is very clear to me, but
14   apparently there is a legal distinction, so I wanted
15   to make it clear that I am not an attorney that could
16   offer that.  I would only speak of natural versus
17   unnatural with respect to – as an architect speaking
18   within my boundaries as an architect.
19       Q.  And what has made you an expert in the areas
20   that are listed there?
21       A.  My training, experience in all of these
22   day-to-day use of these codes.
23       Q.  So you're saying the terms natural versus
24   unnatural accumulation of snow and ice is an

Page 43

1    architectural term?
2        A.  With respect to weather and ice formation is
3    taking place on a walking surface or in a driveway or
4    a place where people are walking around, pedestrians,
5    there is site design and/or roofing and/or other
6    factors that as an architect if someone does something
7    incorrectly, you'll get unnatural accumulations of ice
8    that are based on design defects and the same can be
9    true about unnatural accumulations of ice due to
10   improper maintenance of a property.
11       Q.  Okay.  So going back to Exhibit 5, which is
12   your report, and the first section entitled, project
13   summary, the first paragraph, does that paragraph
14   provide a full description of what you were hired to
15   do in this case?
16       A.  Yeah.
17       Q.  Did your assignment ever change?
18       A.  No.
19       Q.  And we saw in that e-mail Counsel sent to you
20   on March 28, 2022, page two of Exhibit 2, Counsel told
21   you she was caused to fall to the ground due to the
22   height differentiation between the asphalt and
23   concrete channel, correct?
24       A.  That's right.

Page 44

1        Q.  So regarding causation, what was your
2    understanding of what Counsel was asking you to
3    determine?
4        A.  He wanted me to review the documentation and
5    see if the features associated with this concrete
6    gutter and an adjacent asphalt parking space, if that
7    differential was excessive, met industry standards,
8    was or wasn't compliant and whether or not it would be
9    something that would contribute or cause the fall to
10   happen.  If I went out there and looked at and said,
11   no, there's is no way this happened, then that would
12   be that.  But I had to review the conditions to the
13   extent that I could to make that determination.
14       Q.  Now, looking at the second part, the second
15   section of that project summary, did you review or
16   rely on any documents, materials or information for
17   this case that are not listed there?
18       A.  As long as – you know, we have gone over the
19   e-mails that were sent from Nemeroff's Law Firm.  I
20   relied on everything that was sent by his law firm.
21   If it's not listed in this, it's just due to an
22   oversight in transcribing the files that were sent.
23   So I would have to do a cross comparison to check.
24   But I relied on the e-mails that were sent by

Page 45

1    Nemeroff's Law Office as well as the items that I
2    included here that were not provided by Nemeroff's law
3    office.
4            MR. NEMEROFF:  Stacy, can we take a
5    five-minute break?  We're going to change over.
6    Robert's going to take over the rest of the
7    deposition.
8            (Whereupon, a break was taken,
9            after which the following
10           proceedings were had:)
11           (Whereupon Mr. Nemeroff left the
12           Zoom proceeding and Mr. Hirsch
13           entered.)
14           MS. FULCO:  So just clarify, Robert, you're
15   handling this for the rest of the deposition, correct?
16           MR. HIRSCH:  Yes.
17           MS. FULCO:  Okay, thank you.
18   BY MS. FULCO:
19       Q.  Now, I just want to clarify your last answer.
20   So you said any e-mails that Counsel sent you, any
21   information in the e-mails that Counsel sent you, you
22   relied on that information as well, correct?
23       A.  Yeah, I think – I tried to transcribe all of
24   that information from the e-mails to this report.  I

DAVID   SCHROEDER
May 31, 2022

Page 46

1   just want to make sure you have seen a list of all of
2   the items that were sent.  I just want to make sure if
3   I miss something in the transcription, I just want to
4   be clear I did rely on all of the things that were
5   sent by Nemeroff's office.
6      Q.  So I guess the only thing I would be
7   concerned about is if there is an e-mail out there
8   that I have not seen that is providing you
9   something –
10      A.  No, you've seen them all –
11      Q.  – because your answer is kind of saying you
12   could have gotten really anything?
13      A.  No, my answer is of the e-mails that we have
14   gone over today in this deposition with all of the
15   attachments that we have gone over today in this
16   deposition, I relied on all of those attachments that
17   were sent by Nemeroff Law Office.
18      Q.  Right, thank you.
19      A.  I just want to make sure that when I
20   transcribed that I could have overlooked transcribing
21   them when I made this report.  I just want to make it
22   clear that that is what I relied on.
23      Q.  Got you.  Got you.  Got you.  Now, what you
24   list here as statement of Cynthia Costanzo, that is

Page 47

1   what we looked at as Exhibit Number 3, correct?
2      A.  That's correct.
3      Q.  What you list as photographs of the accident
4   site, those are all the photographs we looked at as
5   Exhibit Number 8, correct?
6      A.  That is correct.
7      Q.  And then the incident report, that is the
8   one-page report from Costco, correct?
9      A.  That's correct.
10      Q.  And then where it says production, all
11   7/27/21, what is that?
12      A.  That is a PDF that was e-mailed to me and it
13   includes photographs that were taken – it looks like
14   they were taken in May of 2021, and they show the
15   parking lot and it also includes a description of
16   depth measurements taken by somebody named Joseph Reid
17   and then read and then it includes Google Map view of
18   a cart corral in the parking lot in the space at
19   issue.  It includes some numbers on some photographs
20   that we have already gone over some of the photographs
21   that these have numbers on them, and that it includes
22   an invoice for Rose Paving to Costco.  It includes an
23   invoice for repairs and maintenance and, yeah, so,
24   anyway, it's a PDF, and it's e-mailed to me and

Page 48

1   hopefully you got copied on it.
2      Q.  How many pages is that PDF?
3      A.  It looks like it's 39 pages all together.
4      Q.  Okay.
5      A.  There's a lot of invoices, bill pave, crack
6   in ceiling, stuff like that.  A lot of invoices of
7   paving and some field measurements that were taken.
8      Q.  Have you personally talked to any of the
9   witnesses in this case?
10      A.  No, I have not.
11      Q.  Have you reviewed any witness deposition
12   testimony of anyone in this case?
13      A.  No, I have not.
14      Q.  Have you or has anyone you work with visit
15   the Costco Warehouse where the alleged incident
16   occurred?
17      A.  No.
18      Q.  Did anyone assist you in any way with your
19   review of this case or the materials in this case or
20   with the development of the opinions in your report?
21      A.  No.
22      Q.  Since you prepared your report have you
23   reviewed any other materials or have you been given
24   any other additional information or materials?

Page 49

1      A.  Since I reviewed this was I given anything
2   additional?  No.
3      Q.  No.  I said since you prepared your report?
4      A.  Oh, no.
5      Q.  Since you gave us this list, your case list
6   and all that sort of thing, have you been retained as
7   an expert witness in any other case where you prepared
8   a report and you were deposed – strike that.
9        So are there any other cases that you have
10   been retained by Mr. Nemeroff since this one?
11      A.  Since I was hired for this one, have I been
12   hired for anything else since the start of this?
13      Q.  Yes.
14      A.  Yeah, I think there is another one where I
15   went and measured some stair in the building, but I'd
16   have to really go through my e-mails to see.  I got
17   originally was sent something in 2021 for this.  It's
18   been over a year so I think I have been hired for one
19   other thing, but I haven't done any depositions for
20   that or done any reports or anything.
21      Q.  Okay.  Had you ever been retained as an
22   expert in any other case where you prepared a report
23   and you were deposed but you never reviewed any
24   witness testimony, deposition testimony?

DAVID SCHROEDER
May 31, 2022

Page 50

1    A. No, this is the first one, and I'm not sure
2    why I didn't give deposition testimony for this.
3        Q. Did you ever ask?
4        A. No.
5        Q. So in every other case where you have given a
6    deposition and prepared an expert report, you have
7    reviewed the sworn deposition testimony of witnesses,
8    correct?
9        A. I think so. I have to think back. I know
10   that I have offered opinions that many of my opinions
11   don't really depend on any witnesses whatsoever.
12   There certainly have been reports that are not in
13   legal cases where there are no witnesses, but I don't
14   know for sure when it comes to this kind of thing.
15       Q. Do you believe in all of the cases where you
16   have reviewed testimony there have been cases where
17   the deposition testimony about the actual fall
18   incident, about the area where the fall occurred, was
19   relevant to your review?
20       A. Yeah.
21       Q. So if there is deposition testimony about the
22   fall, how it occurred, where it occurred, what the
23   area looked like, do you believe that testimony is
24   relevant when offering opinions?

Page 51

1        A. Yeah, and note at the end of my report I say
2    that I reserve the right to alter my opinions if
3    presented with further evidence and/or information for
4    whatever reason.
5        Q. Is that for any deposition testimony –
6        A. Yeah, any information about the case. If I'm
7    given more information that is contradictory or
8    provides elucidation that is not clear from what I
9    received, I reserve the right to change it depending.
10       Q. Did you make any assumptions about the
11   incident or the area at issue when you reviewed this
12   case and developed your opinions?
13       A. Assumptions? It's pretty straightforward
14   when you look at this. It's not done right. It
15   doesn't meet industry standards, and it's a dangerous
16   situation in a parking. So that's really easy just
17   looking at any of the photographs.
18       There was two things – there was an
19   assumption that I made going through, and it's
20   actually not really an assumption, it's an opinion
21   that's based on my experience and you can even see it
22   in some of the photographs is that there was a lot of
23   variation in the amount of height differential taken
24   from the – there were measurements of the

Page 52

1    differential that were taken by somebody, I'm not sure
2    who it was, which show a smaller area or smaller
3    differential than what the plaintiff said that she
4    measured. Now, granted – so I have two things that
5    are that are my opinion about this. One is that,
6    first, the plaintiff, based on my experience, where
7    that height differential changed significantly based
8    on where you measure, so my assumption number one or
9    my opinion number one is that the plaintiff, where she
10   said that she measured the height differential, that's
11   going to be more accurate than just – it's going to
12   be the right location. The other thing is she
13   measured the height differential about a month later
14   after the accident, and the other person measures when
15   it was warm outside. And when she measured there was
16   frost on the ground, and it's my opinion if there is
17   any height differential, it's probably going to be
18   greater when it's cold outside and the front is
19   frozen, particularly if there is frost involved.
20       My working opinion then is that her
21   measurements at the time – much closer to the time of
22   the accident would be more accurate than the
23   measurements taken during the spring and May when the
24   ground is not – there is no chance that the ground is

Page 53

1    frozen.
2        Q. Okay. Now, would I be correct in saying,
3    though, that that also assumes that where the
4    plaintiff measured is actually where her foot was when
5    she fell?
6        A. Yes, it assumes that the plaintiff is telling
7    the truth about where she took her measurements and
8    what she ended up with for her measurements.
9        Q. Well, and you haven't read her testimony so
10   you don't know if she went back to measure if she knew
11   if she was measuring at the exact same place where her
12   foot was, correct?
13       A. Yeah, I don't know what she said in her
14   testimony versus what she said in her statement.
15       Q. And if someone is involved in an incident and
16   they go to a hospital, it's something you can easily
17   perceive that if they go back weeks later, they may
18   not know the exact place their foot was when they had
19   that incident, correct?
20       A. Well, that'd certainly be very close given
21   that she, based on the testimony – or what she said
22   that she was exiting the front door of her car and the
23   car she parked the same car in the same place, it
24   would be within a pretty close – pretty close to

DAVID   SCHROEDER
May 31, 2022

Page 54

1   where it was. It may not be exact for any of these
2   things, though, but it would be certainly closer than
3   in the space further down in a different space.
4       Q. And did you make any other assumptions or
5   rely on any other assumptions when you reviewed the
6   case and developed your opinions?
7       A. I'm presuming that people are telling the
8   truth, no, I don't think so.
9       Q. Now, looking at -- do you have your report in
10  front of you?
11      A. I can get it in front of me.
12      Q. I can share my screen if it's easier for you?
13      A. Let's share a screen, that would be great.
14  I'd really appreciate that.
15      Q. Okay, so you see my report looking at the
16  reference section, the location of the incident you
17  referred to the Costanzo dot overview dot PDF?
18      A. Yes.
19      Q. I'm going to show you what I have marked as
20  Schroeder Deposition Exhibit 12?
21      A. Yes.
22      Q. Is this the document you're referring to
23  there?
24      A. That's correct.

Page 55

1       Q. Do you know who wrote the wording on this
2   document?
3       A. No.
4       Q. And so did anyone tell you this document
5   shows the location of the incident?
6       A. It says I was parked in B, so I presume that
7   this was made by the plaintiff, but I don't know for
8   sure.
9       Q. So did you assume the fall location was where
10  B is showing?
11      A. That's correct.
12      Q. Did Counsel ever tell you that?
13      A. I don't remember.
14      Q. Was it your understanding that parking space
15  marked as B was directly next to the cart corral
16  marked as A?
17      A. Yes.
18      Q. Was there anything between the two?
19      A. Yeah, there was a concrete curb and a
20  concrete gutter in a little landscaped area that you
21  can see from the photographs.
22      Q. And where did you obtain that information?
23      A. Where did I obtain what information?
24      Q. About the landscaped area?

Page 56

1       A. When I looked at the photographs that were
2   provided by defense and by plaintiff, it was pretty
3   clear -- it was pretty easy to reconstruct where these
4   things were taken seeing that people weren't just
5   going off of left field taking pictures of some other
6   location.
7       Q. So to figure out the area of the incident,
8   you had to rely on photographs because you didn't have
9   her deposition testimony, right?
10      A. Well, I had this drawing that was right
11  here -- or this Google Maps that said I was parked in
12  B, and then I was also given some other items which
13  talks -- there is like photo C7.27.2021.pdf that shows
14  a cart corral in a satellite view that is closer. It
15  shows what they marked as W and E, which is west and
16  east, and that shows a car. And then when you look at
17  the photographs that also were provided, it's pretty
18  clear where the incident took place and where the
19  measurements were taking place, so it wasn't very hard
20  to piece together.
21      Q. Right. But instead of relying on the
22  deposition testimony, you had to use those exhibits of
23  depositions?
24      A. Yeah, I would still these those exhibits --

Page 57

1   if I had a deposition testimony, I would still need
2   those exhibits to piece it together because the
3   pictures make it clear where things take place.
4       This picture right here, which is marked B,
5   probably faster for me to understand where it took
6   place from this picture than what would be pieced
7   together in deposition testimony. Words are good but
8   pictures are easier to go through after the fact.
9       Q. You also have to assume, because you haven't
10  had anybody testify, you're assuming information
11  provided to you by Counsel as evidence and correct
12  without having the witness tell you what this document
13  is and who wrote on it and what information it's
14  providing you, correct?
15      A. Sure, I'm making the assumption that what is
16  being provided here is, in fact, accurate and that is,
17  once again, if there is other information which is
18  contradictory to this which I have not seen, I, once
19  again, I reserve the right to alter my opinion as
20  necessary based on, you know, whatever facts are in
21  front of me.
22      Q. Right. But we are here today because you
23  have offered a report with opinions?
24      A. That's correct.

DAVID   SCHROEDER
May 31, 2022

Page 58

1    Q.  And counsel has disclosed you and it's not my
2    job to provide you with deposition testimony of
3    witnesses, right?
4    A.  No.
5    Q.  So I'm just trying to clarify that it seems
6    you're relying on a lot of photographs and a lot of
7    documents but you have to make assumptions as to those
8    because you have never seen any of the deposition
9    testimony where people actually explain who created
10   those documents, who took those documents and what
11   they are referring to, right?
12   A.  That's correct.
13   Q.  So going back to your report, Exhibit 5, the
14   rest of the information -- so we talked about that
15   Costanzo overview PDF where that came from -- or at
16   least we clarified which document you were referring
17   to.
18   A.  Sure.
19   Q.  When it comes to this other information like
20   time of the fall, date of the fall, where did you
21   obtain that information?
22   A.  Well, there was -- the statement, which she
23   said and then there was also an incident report which
24   includes that information as well.

Page 59

1    Q.  Now, the description of the accident site,
2    looking at that section on your report, Exhibit 5,
3    sentence number one, where did you obtain that
4    information?
5    A.  The driver's side?  I believe it is from her
6    statement.
7    Q.  And sentence number two, where did you obtain
8    the information that is written there?
9    A.  I believe it is from her statement as well.
10   Q.  Is it your understanding that she personally
11   measured the junction between the two surfaces where
12   she fell?
13   A.  Yes.
14   Q.  Statement number -- or sentence number three,
15   where did you obtain that information?
16   A.  From her statement.
17   Q.  Did you assume that measurement was correct
18   for the date of the incident?
19   A.  Yeah, I assumed everybody that measured
20   things were measuring accurately because tape measures
21   are not very difficult to operate -- that includes
22   Mr. Reid's measurements as well.
23   Q.  Did you assume that measurement was taken at
24   the location where she had her incident?

Page 60

1    A.  Yes.
2    Q.  Can you tell me what the plaintiff did to
3    measure the area, how that was done?
4    A.  Yeah, she said they marked on his boot and
5    measured -- or his heel and measured there from the
6    heel from top to bottom to where they marked it on the
7    scale.
8    Q.  You said they made a mark on the boot heel?
9    A.  They used his heel to measure the height.  I
10   presume they made a mark on it, but they may have just
11   measured it.
12   Q.  When did they then measure the heel?
13   A.  The measurements were taken approximately
14   three weeks after the accident is what my recollection
15   is from the various documents.
16   Q.  Do you know if they made the mark on the boot
17   and measured the heel on the same day at the same
18   time?
19   A.  That's my presumption.
20   Q.  Because if he had -- if they did the marking
21   on the boot and then they didn't measure the boot and
22   he wore the boot for a year, I mean, that could alter
23   the measurement, right?
24   A.  If that is the case, then it's possible that

Page 61

1    that could alter the measurement.  But I have no
2    evidence either way that that would be the case and
3    that would be a very bizarre way of measuring a
4    height.
5    Q.  Do you agree from just the way the plaintiff
6    did their measurements that there is room for error
7    there?
8    A.  There is room for error in any measurement
9    that is taken by anybody, and it doesn't seem
10   particularly more likely than measuring an uneven
11   surface with this than another.  It's very difficult
12   to measure uneven surfaces like this.
13   Q.  What if they didn't mark the boot?  What they
14   put the boot up and then later on measured the heel?
15   Do you agree that there is room for error --
16   A.  Sure.
17   Q.  -- with this type of a measurement?
18   A.  Sure.
19   Q.  Now, sentence number four in this section, it
20   says, photographs indicate that this level; do you see
21   that part?
22   A.  That should be gone -- strike it.
23   Q.  Can I ask a question first?
24   A.  Yes.

DAVID SCHROEDER
May 31, 2022

Page 62

1    Q. So I'm asking what that means?

2    A. Nothing, it should be gone. I mean

3    photographs indicate this level change is abrupt, how

4    about that? We can put that in there, but it's –

5    Q. So, wait, are you saying remove that sentence

6    or are you adding to the report, which one?

7    A. Let's remove it. It doesn't make any sense

8    at all.

9    Q. Okay. Sentence number five you obtained this

10   information from the document completed and signed by

11   Joe Reid with his measurements, correct?

12   A. That's correct.

13   Q. Now I want to show you what is marked as

14   Schroeder Deposition Exhibit 3. Is this the document

15   you were referring to when you talked about Joe Reid's

16   measurements?

17   A. Yeah, that is – those measurements were

18   recorded there, yep.

19   Q. Were you given this dep measurement document

20   with the Exhibits 1, 2 and 3 attached to it?

21   A. I was given that as a part of a PDF that has

22   39 pages which include photographs A that were taken

23   on 5/20, photograph B that was taken on 5/20,

24   photograph C that was taken on that day, photograph D

Page 63

1    that was taken on that day, photograph E, F, G and

2    then it has the depth measurements and then it has

3    Google satellite view with areas measured and then –

4    Q. If I may, there is a specific exhibit, as you

5    can see in this dep measurement, it says Exhibit

6    Number 1, Exhibit Number 2, attached, attached –

7    A. Yeah, I've got Exhibit 1 –

8    Q. If you could let me talk because we don't talk at

9    the same time.

10   Exhibit Number 3, attached. When I was

11   produced this by Counsel, those three exhibits were

12   not attached. So my question is, when you received

13   this document, Exhibit 13, were Exhibit Numbers 1, 2

14   and 3 attached?

15   A. Yeah, Exhibit 1, 2 and 3 were all included

16   along with – you know, there were 39 pages that were

17   all sent to me that were in here and that includes

18   pages that were marked Exhibit 1, 2 and 3.

19   Q. Okay. So when you reviewed this document,

20   Exhibit 13, did you know what locations were being

21   referenced to in the document?

22   A. Yep.

23   Q. So if we look then at – let me show you what

24   I have marked as Exhibit 14, and this is Schroeder

Page 64

1    Deposition Exhibit 14. Is that same depth measurement

2    document but now we've got Exhibit 1, 2 and 3 attached

3    to it?

4    A. That's right.

5    Q. Okay. So did you see – you see, though,

6    there is red numbers on each exhibit number – on each

7    exhibit?

8    A. Yes.

9    Q. Did you have that with these images with

10   corresponding numbers?

11   A. Yes.

12   Q. Now, looking at Exhibit 2 and 3 of the depth

13   measurements of Exhibit 14, do you know where along

14   that junction between the asphalt and the cement the

15   plaintiff was stepping when she fell?

16   A. Where on the junction between the asphalt –

17   on this it would be somewhere it looks like – this is

18   a photograph that has been labeled with numbers and

19   there is no tape measure that shows where each one was

20   done, so this looks pretty inaccurate. But if it was

21   based on this, based on eyeballing, it would be

22   somewhere around four would be the best estimate. But

23   when I look at this and look at the view from above,

24   it would be a very strange to look to make

Page 65

1    measurements so close together on the foreground and

2    so far apart in the background, so it's unclear where

3    these measurements were taken. I would say the best

4    bet from this photograph in Exhibit 2 would be

5    somewhere around four.

6    Q. So just to clarify, we are looking at

7    Exhibit 2 of the depth measurement document, which is

8    Exhibit 13 to the deposition?

9    A. True.

10   Q. Using this exhibit, you believe the plaintiff

11   was standing near – the closest you can show where

12   she was standing is near the red number four on this

13   exhibit; is that correct?

14   A. Yeah, but I have no idea if that four

15   correlates to an actual location of where somebody

16   measured because –

17   Q. That was not my question, though –

18   A. No, no, I know. I want to make clear that

19   based on this, it would be four, but I have no

20   confidence that four that is located on this

21   photograph is the exact location where four was

22   actually measured, because this is a photograph where

23   somebody has clearly just come and marked locations.

24   But it's not a measured drawing. There is no way of

DAVID   SCHROEDER
May 31, 2022

**Page 66**

1 really knowing. It looks like it's eyeballed all the
2 way around.
3 Q. And, again, that has nothing to do with my
4 question. So my question is only: Looking at this
5 photograph, if you know, if you can tell me looking at
6 photograph two of Exhibit 13, can you tell me where
7 the plaintiff's foot was when she fell and your
8 testimony is your best knowledge is at number four,
9 correct?
10 A. Approximately four. Approximately four, yep.
11 Q. Now, if you look at image number three of
12 Exhibit 13, Exhibit 3, Exhibit 13, do you know if she
13 was standing anywhere in this location when she fell?
14 A. I don't think so.
15 Q. Okay. Now going back to Exhibit 5, sentence
16 six of the description of accident site, you assume
17 the plaintiff took her measurement at the exact
18 location of her fall, correct?
19 A. That's right.
20 Q. And we talked about that, that is based on
21 her statement that you made that assumption, correct?
22 A. Based on her statement that – yeah, I made
23 the assumption that where she stated she measured that
24 it was accurate and that she knew where it was and

**Page 67**

1 that it took place – her measurements took place when
2 the ground was still cold as opposed to months later
3 where it was warm and there is no chance of frost.
4 Q. So for purposes of your analysis and
5 opinions, you assumed the measurement of the height
6 difference at the area of the fall was one and
7 three-fourths inches, correct?
8 A. Correct.
9 Q. And then in sentence seven, you clarify that
10 even if the height was one-and-a-half inches, your
11 opinions remain the same, correct?
12 A. Yeah, even if it was at 1 inch, my opinions
13 would be the same.
14 Q. At what height difference would your opinions
15 change?
16 A. Once it reached the Code requirements of, I
17 believe, it's half inch, quarter inch, I'd have to
18 look at the Code, but we're so far above the Code
19 requirements for level change to not be a problem that
20 it's ridiculous so –
21 Q. Which one is it then, the half inch or the
22 quarter inch? So if you could answer if these codes
23 are ones that you have provided?
24 A. I believe The Code requires it to be a

**Page 68**

1 quarter inch is what The Code requires it to be or
2 less or beveled if it's between a quarter inch and a
3 half inch.
4 Q. So the height difference that would change
5 your opinion is if this height difference was a
6 quarter inch?
7 A. Or a half inch and beveled.
8 Q. Anything over that, your opinion would stand?
9 A. Yeah, my opinions would stand basically, but
10 these are the industry standards and the codes.
11 Q. Have you ever been to that parking lot and
12 inspected the area at issue?
13 A. No.
14 Q. Did you ever take measurements yourself?
15 A. No.
16 Q. Did you do anything to determine the height
17 difference between the asphalt and the cement at the
18 time of the incident?
19 A. No, no.
20 Q. Now, looking at the description of accident
21 section, where did you get that information?
22 A. From the incident report and her statement.
23 Q. Which foot did she step with?
24 A. I don't recall.

**Page 69**

1 Q. Do you know if you were ever given that
2 information?
3 A. I don't recall if she indicated it or not.
4 Q. Do you know anything about her movements or
5 how the incident occurred other than this one
6 sentence?
7 A. I would refer directly to the statements of
8 Cynthia Costanzo and to the incident report that was
9 provided.
10 Q. Do you know anything about her movements or
11 how the incident occurred other than what is in those
12 two documents?
13 A. No.
14 Q. In forming your opinions in this case you
15 accept it as true that what you documented under
16 description of accident is how the incident occurred,
17 true?
18 A. Yes.
19 Q. Now, looking at your opinion section, this
20 section lists all of your opinions in this case and
21 your bases for each opinion are outlined in italics
22 after each opinion, correct?
23 A. Yep.
24 Q. Are all of your opinions in this case

DAVID  SCHROEDER
May 31, 2022

Page 70

1  contained in this report?
2      A.  Yeah, as far as -- I have some opinions that
3  don't seem to be relevant to this case, which are not
4  necessarily in this report that don't really matter
5  with respect to the height differential.  But I have
6  these opinions.  They are just not necessarily
7  directly relevant to the case.
8      Q.  Now, I numbered each opinion here, you'll see
9  to the left to make it easier just for us to reference
10  them today (indicating).  Can you see that?
11      A.  Yep.
12      Q.  So opinion number, one who decides what safe
13  means and when something is considered safe?
14      A.  Well, there is an industry standard which is
15  called the -- which is, you know, codes generally tell
16  you what is safe.  And if it's not a Code,
17  sometimes codes will just refer to things.  Say, oh,
18  yeah, it's got to be maintained safe.  So then people
19  who are in the design industry, the architects and
20  engineers, we refer to industry standards to determine
21  what is safe.  So things like the ASTM standard, which
22  I cite, is a good example of what is considered safe
23  by industry standards.
24      Q.  So does the ASTM standard actually define

Page 71

1  what safe means or are you saying it just lays out
2  specific like the quarter inch that you talked about?
3      A.  Well, that particular standard, the title of
4  it is -- the title of that thing is Standards for Safe
5  Walking Surfaces, and it's essentially a bunch of
6  people who are in the industry say if you want
7  something to be considered reasonably safe, then you
8  have to meet these standards.  And if it's not, the
9  corollary is it would be unsafe if it doesn't meet
10  these standards.
11      Q.  So from your perspective of opinion number
12  one, what you're saying as to the definition of safe
13  is what is under the ASTM standard?
14      A.  That is correct.  That is an industry
15  standard.  It's not controversial when she describes
16  what is a safe walking surface and even within that
17  document, they acknowledge that even if you meet all
18  of these standards, you're not going to have
19  necessarily a safe walking surface, that is just
20  considered what is the industry standard for what is a
21  safe walking surface.
22          If you look at the standard, and I believe I
23  sent it to you, Section 1.2 says:  Conformance with
24  this practice will not alleviate all hazards -- will

Page 72

1  reduce certain pedestrian risks.
2      Q.  Do they define what -- if even meeting these
3  standards isn't a safe walking surface, do they define
4  what is an absolutely safe walking surface?
5      A.  They say if it's in compliance with this.  It
6  doesn't say it will alleviate all hazards for walking.
7  So, for example, if you meet these safe walking
8  surface standards and somebody is carrying 100 pounds
9  of cement while walking around in high heels, there is
10  no walking surface that would be safe.
11      Q.  So based in your opinion that you issued
12  number one, you're saying that the group or the people
13  that get to decide what safe means, in your opinion,
14  is ASTM?
15      A.  ASTM is -- you know, I have my opinion as an
16  architect who has been practicing for 20-some years
17  and know that what would be rejected from a job site
18  because of the possibility of tripping hazards or
19  people dying from falling on a tripping hazard, so I
20  can tell you what I have for safety, but we have a
21  whole industry standard which is the ASTM, standard
22  practice for safe walking surfaces, which has industry
23  stakeholders from the construction industry, the
24  architecture industry, from the manufactures of

Page 73

1  building materials who have walking surfaces and this
2  is something that is agreed upon in the industry as if
3  you comply with the guidelines of this standard,
4  you're going to end up with a reasonably safe walking
5  surface for pedestrians using normal footwear, that is
6  it.  And this is something that architecture is 1000,
7  2000 years old as an industry and we have our
8  standards.  This is a pretty good amalgamation of what
9  those standards are for what is considered safe.
10      Q.  So is ASTM a requirement, like a legal
11  requirements on --
12      A.  No, it's a voluntary consensus standard and
13  it's not a Code requirement to meet the voluntary
14  industry standard.
15      Q.  And that standard that you're referring to
16  here is to what is safe, is that applicable to all
17  surfaces regardless of where they are, it doesn't
18  matter if they are inside, outside or whatever?
19      A.  Any surfaces that people are walking on is
20  what it refers to.
21      Q.  So it doesn't take into consideration if it's
22  inside or outside?
23      A.  No, it certainly does.  There is a big
24  section on wheel stops, and I don't very many -- wheel

DAVID SCHROEDER
May 31, 2022

Page 74

1  stops and speed bumps, and I don't know if aside from
2  inside parking garages, wheel stops and speed bumps
3  are usually not present. So it covers that. It also
4  covers gradings in pedestrian walkways. Most gradings
5  that you encounter are on sidewalks outside and not
6  indoors. I can't think of any grade I've ever seen
7  other than air registers on the inside of a building.
8      Q. But as to what is safe because there are
9  certain of those. There are indoor parking garages
10  that actually would have those things, right?
11     A. Sure, this whole standard of addresses
12  exterior walkways as well and, in fact, it says that
13  through exterior – 5.7.2 says exterior walkways
14  should be repaired or replaced where there's an abrupt
15  variation in elevation between surfaces. Variation in
16  vertical displacements in exterior walkway shall be
17  transitioned according to 5.2, so, yeah, 5.2 says that
18  changes in level up to one quarter inch may be
19  vertical without edge treatment but changes between
20  those two, quarter inch and half inch shall be beveled
21  to a slope no greater than two. And changes in level
22  grade on a half inch shall be transitioned by use of a
23  ramp or stairway that complies with the applicable
24  building codes, so it's very clearly covers exterior

Page 75

1  walkways with this scenario.
2      Q. So the way you're talking about the half inch
3  beveled, the quarter inch non beveled, is that the
4  same both inside and outside parking lots?
5      A. Yes, and that also correlates with the
6  Federal law with the Americans With Disabilities Act,
7  so it's all consistent.
8      Q. And is that the same throughout the country?
9      A. Yep.
10     Q. So looking at opinion number two, do you know
11  what causes there to be a height change between
12  asphalt and a cement curb in a parking lot in this
13  area of the country?
14     A. What causes that? A lot of things can cause
15  that. One of them is when they poured the – so you
16  typically pour your concrete curb first and then in
17  this case there is a gutter as well and then you put
18  in your asphalt and then you – you know, you'll
19  usually will see these things like the rollers that
20  will roll it down and smooth it. Somebody can mess up
21  from the very beginning and place it so that the
22  asphalt, like in this case it could be – I'm not
23  saying this is the case here but where it can be too
24  high. It doesn't – it's not ever installed correctly

Page 76

1  from the get-go and it's higher than the concrete
2  gutter, so that is option one. It's broken from day
3  one.
4      Option two is that you have – you don't put
5  in gravel under your asphalt or the gravel that you do
6  put under your asphalt is not tamped. And so what can
7  happen then is you get – water gets in there where
8  ground water exists, and there is no what is called a
9  capillary break and if the ground is frozen, it will
10  push up your asphalt. And that looks to me – like
11  even if I look at the photographs that were taken the
12  day of the accident versus the photographs that were
13  taken what appears to be in May, later, it looks like
14  the height differential is much worse in winter than
15  it is just eyeballing. You can see it. So there is
16  that.
17     And then sometimes what can happen as well is
18  at the joint between the asphalt and the curb you can
19  get water in there and that can freeze even if you
20  have good gravel and can push the asphalt up relative
21  to the concrete. So it's either installed incorrectly
22  from the get-go or you have a situation where it's
23  deteriorated to a place where water is getting in
24  there and causing frost heave on the asphalt and

Page 77

1  because the asphalt is higher up compared to where the
2  concrete. So you'll get more frost heave or heat in
3  the asphalt than you would in the gutter.
4      Q. So you're saying based on the photographs you
5  saw, those – possibly, the second and third
6  possibility that involve water getting underneath the
7  concrete and being impacted by freezing, that appears
8  to be to you what potentially occurred here?
9      A. Yeah, it looks taller in the winter. The
10  level changes looks taller in the winter than in the
11  summer.
12     Q. So the height difference between the asphalt
13  and the cement can change with weather conditions
14  because freezing can actually increase the height?
15     A. Yeah, it's not supposed to. If it's
16  installed properly from the get-go, you have very
17  little of that. But if you have – if it's installed
18  poorly or you have a situation where water is getting
19  underneath the joint between the asphalt and the
20  concrete curb is degraded or you get water underneath,
21  it just percolates through, you can get frost and have
22  big problems with this.
23     Q. What type of weather conditions can cause the
24  more significant difference in height between two

DAVID  SCHROEDER
May 31, 2022

Page 78

1  outdoor ground surfaces?
2     A. Weather conditions? Well, if you have a poor
3  installation where you don't have a capillary break,
4  no gravel or untamped gravel and then water gets under
5  there and causes –
6     Q. My question is specific to what type of
7  weather conditions causes the more significant
8  difference in height between the two ground outdoor
9  surfaces?
10     A. If you have a defective or improperly
11  maintained asphalt surface like this, if it's
12  defectively installed or defectively maintained, if
13  you get water plus cold or potentially the defect is
14  just in the lack of gravel, just cold and the water is
15  in the ground doesn't have a place to have any relief,
16  then you can have the different movement like this.
17     Q. When you say cold, how cold?
18     A. Subfreezing. As long as the ground stays
19  cold and it doesn't necessarily have to be freezing
20  outside. If you have a cold spell for a few weeks and
21  then it warms up, your ground is still going to stay
22  frozen for a while and the settlement doesn't go all
23  the way down either necessarily. It doesn't always
24  settle to where it was originally.

Page 79

1     Q. With that scenario, what type of weather
2  conditions then tend to cause the difference in height
3  to shrink or lessen?
4     A. When ice thaws out and is given time to thaw
5  out, it usually results in if there is a difference in
6  height, it will get lesser or it will be less
7  pronounced.
8     Q. And this change in height can occur wherever
9  there's a joint or junction in ground surface like
10  between – it doesn't have to be asphalt and concrete;
11  it can be other ground surfaces as well, correct?
12     A. It's possible. But only – it typically only
13  happens – or not only, but it usually happens when
14  there is a defect and it takes place over time. It
15  can also have differential change in heights from
16  other items other than improper gravel compaction and
17  water freezing. It's not only that as a potential
18  cause. But it can happen anywhere, but it usually
19  does not happen anywhere or everywhere.
20     Q. In your opinion what amount of change in
21  level is not a potential tripping hazard?
22     A. Once again, back to the ASTM standards, you
23  have got to maintain your parking lots properly and
24  get the installation done right from the get-go.

Page 80

1     Q. But I need – not just referring to ASTM. In
2  your opinion – let me ask the question.
3       In your opinion, what amount of change in
4  level is not a potential tripping hazard?
5     A. As long as the quarter inch abrupt change in
6  level is maintained, it's not a potentially tripping
7  hazard. That is something achieved in most sidewalks
8  an most joints between asphalt and the concrete, and
9  it's maintained the whole winter. It's usually only a
10  result of a defect, which is an installation defect
11  from the get-go which then gets worse over time.
12     Q. I only asked you for the number, that's all
13  I –
14     A. Yeah, it's the same as what it's always been
15  in my opinion.
16     Q. Does it matter to you if the change in level
17  is indoors or outdoors or does the same number apply?
18     A. Same number.
19     Q. Now, looking at opinion 2-C, it says an
20  unusual location. What does that mean?
21     A. Well, you know, this is a change in level
22  that is taking place and we are talking, you know,
23  about an inch and three quarters what they measured.
24  Inch-and-three-quarter-inch level change is not

Page 81

1  something – that is a huge level change in a walking
2  surface. And so when you have a level change that is
3  in a walking surface, it's at an unusual location.
4  You don't expect your walking surfaces to have these
5  big changes, particularly in a parking lot like this.
6  It's unusual. This is the first time I have seen one
7  of these that is – you know, I have seen some things
8  before, but I'm – I look out my window and I see the
9  street with the curb and there is nothing like this.
10  There is no inch and three-quarter level change. It's
11  very unusual. It's an unusual thing to open your car
12  door and step out and encounter a level change this
13  great, so it's unusual so it's not something people
14  are on the lookout for and checking for when they are
15  exiting their car.
16     Q. So with that explanation where is the usual
17  location?
18     A. Level change in a walking surface is not
19  usual. The only places where you would expect a level
20  change in a walking surface are like at a curb, the
21  curb itself, you know, that goes up 6 inches. You
22  step from the gutter up on to the landscaped area, you
23  step when you're crossing the street, you step from
24  the curb down. That is a level change that is part of

DAVID SCHROEDER
May 31, 2022

Page 82

1  your walking, your everyday walking surface that you
2  would expect.
3      Q.  And this incident occurred a few inches from
4  that curb, correct?
5      A.  Yeah, about a foot away from that curb.
6      Q.  The section you referred to here with opinion
7  2-C, 7.2.3 of the staircase, that is talking about
8  stairs, correct?
9      A.  That's correct.
10     Q.  And there were no stairs in the area of this
11 incident, correct?
12     A.  That is correct.
13     Q.  So why are you asserting that that section is
14 relevant to the area at issue in this case?
15     A.  Because when people study the accents of
16 stairs, they talk about how stairs that have a single
17 riser, which are significantly bigger than this, are
18 extremely difficult to notice because perceptually
19 there's such a small level change.  And in this case
20 it's even smaller than a stair.  It further bolsters
21 my opinion that because it's in an unusual location
22 and it's so small, it makes it hazardous, that's it.
23 So the staircase studies on accents of single riser
24 stairs is directly applicable to this and, in fact,

Page 83

1  this is worse than what happens with accent single
2  riser stairs because the level change is so small it's
3  difficult to notice but large enough to be a tripping
4  hazard.  Anything above a quarter inch is considered a
5  tripping hazard in our industry.
6      Q.  Are you stating it is unusual for there to be
7  a difference in height where asphalt and cement meet
8  outdoors?
9      A.  Yeah, an inch and three-quarters, for sure,
10 an inch for sure.  It's very unusual.
11     Q.  So in your experience in this area, meaning
12 Northern Illinois, there is typically no difference in
13 height or it's up to or less than a quarter of an inch
14 or half an inch beveled between asphalt and cement
15 where it meets outdoors, correct?
16     A.  It's usually significantly smaller than what
17 is here.  It doesn't always comply with industry
18 standards, but it's significantly smaller than what is
19 encountered at this location.
20     Q.  So if what I said is not correct, than what
21 is it typically?
22     A.  I would have to do a go-around and do a
23 survey of all the joints, but it's typically
24 significantly smaller than what has taken place here.

Page 84

1      Q.  But what do you consider significantly lower
2  than what we have here to be what is typical in this
3  area?
4      A.  You know, when it comes to something like
5  this, The Code requirement is a quarter inch and the
6  industry standard is a quarter inch.  If you had a
7  level change that was a half inch, I would not be
8  surprised.  If it was three quarters of an inch, I
9  would say, yeah, that's pretty far off of the industry
10 standard and really pushing it.  But an inch is really
11 far and an inch and three-quarters is ridiculously far
12 for a level change.
13     Q.  That is not my question.  I'm asking you,
14 based on your experience, how long have you lived in
15 Northern Illinois?
16     A.  Since I was about 30 years.
17     Q.  So you have been living and working as an
18 architect in Northern Illinois.  I'm asking you just
19 based on what you have seen and experienced personally
20 and professionally what do you believe is the typical
21 range of outdoor – the difference in height between
22 asphalt and cement outdoors in this area?
23     A.  Less than three quarters of an inch.
24     Q.  Now, looking at 2-D, is it your opinion

Page 85

1  any change in height between two surfaces that is less
2  than 18 inches is a tripping hazard?
3      A.  Yeah, if it's – no, that is not what this
4  says.  It says that level changes less than 18 inches
5  are difficult to notice and do create a tripping
6  hazard when it comes to stairs.  If you have a level
7  change with stairs, it's difficult to notice any
8  height difference of less than 18 inches.
9      Q.  Why would that be relevant if it's stairs of
10 18 inches when we are not talking about stairs?
11     A.  This is – when it comes to being able to
12 perceive the level change between adjacent horizontal
13 surfaces perceptually it is difficult to notice level
14 changes that are pretty large.  And when it comes to
15 staircases they talk about that, and that is where you
16 have typically the same material that takes place as
17 you're going up and down the stairs.  And people will
18 just fall downstairs sometimes if they are less than
19 18 inches, if it's less than three steps, people will
20 not be as likely to notice them, and it's just to
21 demonstrate that when you have small adjacent level
22 changes that you're walking on, small level change
23 heights are difficult to notice and they are – within
24 my industry it's well acknowledged so when you have a

DAVID SCHROEDER
May 31, 2022

Page 86

1  level change of only an inch and three quarters, which
2  is significant to cause an accident. If you're
3  stepping on it, you're not as likely to notice that
4  than you would if it was significantly larger, that's
5  all.
6     Q.  So is that indicating, in your opinion, that
7  people won't notice a level change typically unless
8  it's 18 inches or more?
9     A.  It's contextual. If it's a stair and same
10  material, they are less likely to notice that than if
11  it's larger than that. So it's considered in many
12  codes or has been considered a potential tripping
13  hazard to put in a stair that's less than 18 inches
14  tall.
15     Q.  I'm not talking about stairs, though. You're
16  saying you're using this as -- because we know we are
17  not talking about stairs in this case. You're using
18  this as kind of an example. So are you then -- is it
19  your opinion -- is it your statement then that people
20  will not typically notice a level change unless that
21  level change is 18 inches or more?
22     A.  No, that's not my opinion. It is less likely
23  that they will notice a level change that is smaller
24  than 18 inches than it is they will notice a level

Page 87

1  change that is taller than that. That doesn't mean
2  that they are not going to notice it. If you have a
3  16-inch level change, you're most likely going to
4  notice. But if you're walking along from high to low
5  and there is a level change of 16 inches, it's
6  difficult to notice that you have a level change
7  compared to 18 inches or more. It doesn't mean that
8  everybody is going to trip on it. You asked if it's
9  likely that people are going to trip on it? No, it's
10  not likely they're going to trip on it. It's still
11  pretty unlikely. It's just that you're much less
12  perceptually able to notice a smaller level change
13  than say 16 inches than 18 inches. That is, once
14  again, why the studies show you shouldn't put in
15  stairs or level changes where they are in an
16  unexpected location because people will miss it
17  particularly when walking from the upper level to the
18  lower. Lower level to upper level is easier to see.
19  Everyone will see a 16-inch level change. From
20  walking the other direction, you won't see it -- you
21  won't be as likely to see it.
22     Q.  Now, with the stair comparison, though,
23  people also have -- one of the issues and one of the
24  reasons that you have kind of these standards with

Page 88

1  stairs is because people's bodies, just based on
2  habit, tend to do stairs a certain way and lift their
3  leg a certain way, and that is -- kind of goes into
4  the whole formula of what your rise in all of those
5  sorts of things should be, correct?
6     A.  In this situation, no. This is the situation
7  where people are walking along, and they think they
8  are walking on a level surface and the level drops as
9  they're walking. And this is more likely to happen if
10  you have a level change of less than 18 inches than it
11  is if you have a level change of greater than
12  18 inches. So it is very rare for someone who is
13  walking alongside the Grand Canyon not to notice that
14  edge. But if you're walking along on a sidewalk and
15  you were to have a level change that just dropped in
16  your sidewalk in a weird location, that is considered
17  a pretty substantial tripping hazard. And until you
18  get to a drop that is about 18 inches, it is still
19  something that people -- they won't be able to notice
20  it as much as if there is handrails, sure, you'll
21  notice it. If it's just a level change where one is
22  not expected an you're walking on a flat surface and
23  there isn't a -- you know, if you're walking on a
24  sidewalk and it stops and there's grass, you'll

Page 89

1  probably able to notice. But if it's all concrete,
2  you got into a parking lot and you had a level change
3  of 18 inches or less, people are walking along and it
4  just dropped, there is a high likelihood that people
5  would just not see it, which is crazy but true.
6     Q.  Is that why they talk about like painting?
7     A.  Stripes on the edges they put up handrails as
8  visual cues, all of those things prevent people
9  from -- they help let people see there is an edge.
10     Q.  Now, you refer to -- within this opinion 2-D,
11  you refer to the 1985 Lifestyle Code Handbook,
12  5-2.2.45, correct?
13     A.  Yes, the Life Safety Code.
14     Q.  Now, looking at Exhibit 4, and I put page
15  numbers in here so we could refer to it, page seven,
16  now -- and I just highlighted this so we are referring
17  to the same thing here, this is the one you're
18  referring to; is that correct?
19     A.  Yes.
20     Q.  What is the Lifestyle Code Handbook?
21     A.  It's Life Safety Code.
22     Q.  Sorry, that's what I meant. What is the
23  Life Safety Code Handbook?
24     A.  The Life Safety Code is a model Code which is

DAVID  SCHROEDER
May 31, 2022

Page 90

1  adopted by many municipalities around the United
2  States probably worldwide as well, which talks about
3  how to maintain your premises in a safe manner, and it
4  has a focus on fire safety and exiting, so it
5  includes – so the whole purpose is, okay, how do we
6  make sure this is safe?  And it talks about crowd
7  movements as, you know, part of keeping a building
8  safe is crowd movement as well.  But it's something
9  that is adopted by local jurisdictions.
10      Now the Life Safety Code Handbook is you have
11  The Code itself and then the NFPA, which is the
12  organization that writes this Code publishes a
13  handbook which then goes into great detail or greater
14  detail explaining the thinking behind each of The Code
15  provisions, and it's intent for Code officials who are
16  being called on to interpret The Code provisions where
17  it's not crystal clear.  So the goal is to minimize
18  misinterpretations of The Code the way it's written.
19  So the 1985 Code handbook talks about why 5-2.2.4.5
20  limits the number of risers in a flight of stairs.
21  And they say that it's a tripping hazard when you have
22  just two steps because people don't notice it.
23      Q.  Is 1985 the most updated edition?
24      A.  No, it's the only one that I have.  One, the

Page 91

1  NFPA Life Safety Code has removed this Code provision
2  in subsequent issues.  I think they got a lot of
3  complaints from people saying they don't know how to
4  deal with level changes – not enough room for ramps,
5  so it no longer is a Code requirement for the NFPA
6  Life Safety Code.  And I also don't have any of the
7  other ones that have the commentary.  I don't have any
8  of the other handbooks.  So 1985 handbooks has this.
9  I believe they based it out later on, maybe '93 – I'm
10  guessing, I just don't remember.
11      So this just explains that, hey, if you have
12  a level change that's two steps, only two steps, they
13  might not be noticed, and that is something that has
14  been true since steps started getting installed back
15  2000 years ago.  This one Code explains that and I
16  thought it would be useful to see that explanation as
17  part of my opinions as to why the small level changes
18  are hazardous.
19      Q.  So the section of The Code that you referred
20  to, 5-2.2.4.5 was phased out sometime around 1993?
21      A.  Yeah, it was phased out.
22      Q.  And so does that mean if a building was
23  created after 1993 that that Code no longer applies to
24  the building?

Page 92

1      A.  It depends on what – it depends on the
2  jurisdiction, yeah, but the commentary of this Code
3  provision is what I care about –
4      Q.  I'm not asking that.  That's not what my
5  question is.
6      A.  Okay.
7      Q.  So if a commercial building is built after
8  1993, does that section of The Code apply to the
9  building?
10      A.  No, they have changed it.  They talk about
11  the things that you can do if you have fewer than
12  three risers.  They allow it now and they talk about
13  how to make it real crystal clear that there is a
14  riser there – visual cues, like the edge things.
15  They talk about special lighting.  They might even
16  talk about signage, I'm not sure.  But it's
17  acknowledged that it is an issue and this one happens
18  to spell it out in a way that is crystal clear that
19  these small level changes are difficult to see and
20  they cause people to fall.
21      Q.  When this was in effect, was it considered
22  law?
23      A.  It was – wherever it was adopted.  I don't
24  know if it was adopted where this Costco was.  It was

Page 93

1  law for a lot of jurisdictions.
2      Q.  But you don't know if it was adopted by the
3  town where this Costco was?
4      A.  No.
5      Q.  And even if it was adopted there and if the
6  building was erected at that time, there were no
7  stairs in that area.  So this is more of what you were
8  talking before about, a way to explain your thoughts
9  but there are no stairs at issue in this case; am I
10  correct?
11      A.  There are no stairs at issue, but the way The
12  Code is written, you were required to have either
13  stairs or a ramp because this level change is too
14  much, which would be ridiculous to have a stair in a
15  parking lot and it would be ridiculous to have a stair
16  with handrails in a parking lot.  What it really means
17  is the parking lot has to have its level change not be
18  so great, that's all it means.  It means that they
19  were not in compliance with the requirements for
20  having a level change that was less than a quarter
21  inch.  They are deeply in violation, and the only way
22  to comply if you want to have a level change, to have
23  a ramp or a stair with handrails, which is, once
24  again, not something you do in a parking lot.  You get

DAVID   SCHROEDER
May 31, 2022

Page 94

1   your levels to be flat and then you don't have to
2   worry about it.
3       Q.   Do you know if there are any -- you have been
4   in cases with this natural accumulation distinction.
5   You learned that there was a legal distinction that
6   talks about natural accumulation.  You said you're not
7   addressing those issues.  You're talking about it from
8   an architectural standpoint, right?
9       A.   Yes.
10      Q.   You have learned there are some legal
11  concepts about natural accumulation.  Have you ever
12  learned about any legal concepts that may differ
13  between what is acceptable from a height difference?
14      A.   I know that the Federal law requires a
15  quarter inch per foot maximum level change for
16  compliance with the Americans with Disabilities Act.
17  I know that that is something that if you're any
18  private building owner that is a public accommodation,
19  you must comply with it on private property.  There
20  are no ifs, ands or buts -- you're not in compliance.
21  But I've heard something about public sidewalks, that
22  they are not held to the standard that Federal law
23  requires or the Illinois law requires.  Illinois
24  requires the same thing for their Illinois

Page 95

1   Accessibility Code, but I have heard that even though
2   the judges have said even though it's been about this
3   law, they're allowed to be in violation of the law to
4   a certain extent, but I don't know what that extent
5   is.
6       Q.   And what areas does that ADA apply to?
7       A.   It applies to -- what does it apply to?
8       Q.   Yeah.  Is it every single area of the
9   property?
10      A.   You have to have what is known as a -- for
11  ADA you have to have an accessible route so in a
12  parking lot it will be a route that is -- would be
13  from your handicapped parking spots to the front
14  entry.  But if it was a sidewalk on, say, corporate
15  campus, that sidewalk would be a part of your
16  accessible route, so it would be all of the sidewalk
17  so it really depends on the circumstances.
18      Q.   Okay.  Now, going back to Exhibit 5, your
19  report looking at opinion number three, you're saying
20  the area at issue does not comply with any of the
21  industry standards you listed in the section below,
22  correct?
23      A.   That's correct.
24      Q.   And that is because in your opinion in order

Page 96

1   to comply with industry standards, any height
2   difference between asphalt and concrete are two
3   surfaces outdoors should not be more than a quarter of
4   an inch or half an inch if it's beveled; is that
5   correct?
6       A.   That's correct.
7       Q.   Opinion number four, that is the same opinion
8   but that the codes were violated as well, correct?
9       A.   Yeah, so the industry standards are different
10  than the Codes.  The industry standards have not been
11  adopted by local jurisdictions, but in this case we
12  have the Property Maintenance Code, which has been
13  adopted locally and then we have the NFPA Life Safety
14  Code, which has been adopted by the State.
15      Q.   Now looking at the section in your report
16  that says, industry standards, you cited one from the
17  Illinois Department of Transportation highway
18  standards; is that correct?
19      A.   That's correct.
20      Q.   Are all Illinois Department of Transportation
21  highway standards mandated law for commercial
22  properties to follow?
23      A.   No, that is why it's listed as an industry
24  standard and not a Code violation.

Page 97

1       Q.   So it means by being a industry standard,
2   what does that mean?
3       A.   It means that it's standard practice for
4   somebody who is building a parking lot or a road to
5   comply with the standards that are the Illinois
6   Department of Transportation highway standards.  It's
7   very, very -- it's almost ubiquitous.  Every time I'm
8   working on a parking lot, these things have been
9   cited.  I know Chicago ones they have adopted these
10  themselves.  If you're working on a private parking
11  lot for a like a commercial space.  So it's something
12  that is used by most -- for parking lots it's used by
13  almost everybody in the State of Illinois because it's
14  a standard.
15      Q.   If a retail business does not comply with the
16  Illinois Department of Transportation highway
17  standards, is there any regulatory group that will
18  find out and fine or cite the business in any way?
19      A.   No, that is why I listed it as a industry
20  standard and not as a Code violation.
21      Q.   Who determines which industries are
22  recommended to follow something the Illinois
23  Department of Transportation highway standards?
24      A.   Who determines what industries -- can you

DAVID   SCHROEDER
May 31, 2022

Page 98

1  please repeat the question?

2    Q.  Who determines which industries are

3  recommended to follow standards from the Illinois

4  Department of Transportation highway?

5    A.  I don't understand the question.  From the

6  practical matter of these standards that have been

7  published by Illinois Department of Transportation

8  highway standards are if I hire a civil engineer and

9  they have all of these details and standards already

10  in their library and they know they work and so they

11  put them in their drawings for the new parking lots

12  because they know, one, that they work and, two, that

13  it is a standard and, three, they don't have to

14  reinvent.  It saves money.  And they also know that

15  all of the contractors know how to build from these

16  standards.  You start throwing in different standards,

17  they are either not going to work, two, they're going

18  to be really expensive and three the people who are

19  building it are not going to know how to do it.

20    So the fact that these are published and

21  there's so many projects that require compliance with

22  means that from a practical standpoint the civil

23  engineers use it over and over again.  And the

24  contractors know how to do it so they build like this

Page 99

1  over and over again.  That's all it means.

2    Q.  Anywhere in the Illinois Department of

3  Transportation highway standards does it state that

4  they apply to or are recommended for store retail

5  parking lots?

6    A.  No, as I stated below or above and before,

7  there is a reason why I list this as an industry

8  standard and not a Code issue.  It just shows that if

9  you build in Illinois any of the public roads or

10  public sidewalks, this is how they build it.  This is

11  what is done in that standard for the State and, once

12  again, as I elaborated, civil engineers who do any

13  public work will do the same exact things for parking

14  lots and there is, to date, I have seen dozens of

15  parking lot designs, and I have never seen any designs

16  from any civil engineers who don't comply with the

17  Illinois Department of Transportation highway

18  standards for traffic control.

19    Q.  That half inch that you referred to in the

20  Illinois Department of Transportation standard is

21  actually a minimum, right?  The difference in height

22  is supposed to be half an inch so that it can act as a

23  gutter for water?

24    A.  No –

Page 100

1    MR. HIRSCH:  Object –

2    THE WITNESS:  – it's a quarter inch.  And it

3  doesn't list as a minute.  It just lists it as an

4  absolute number.  If they want it to be the minimum,

5  they would write in their minimum.  It's a quarter

6  inch, and, as a matter of fact, there's no way on

7  earth they would ever show anything greater than a

8  quarter inch because that would be in violation of the

9  Illinois Accessibility Code and there's a possibility

10  that you would have someone in a wheelchair going over

11  there, and it's also a recognized tripping hazard.  So

12  there is no way they would ever put it in there as a

13  half inch.  They list it as a quarter inch because

14  that's the industry standard for your maximum height

15  before it becomes a tripping hazard.

16    Q.  So you're saying it's the maximum height is

17  the quarter inch in there?

18    A.  The quarter inch is the maximum height that

19  is allowed before it becomes in violation of other

20  codes.  The Illinois Department of Transportation

21  detail just shows it's a quarter inch, that's it.

22    Q.  So are you saying that this IDOT standard is

23  requiring the height difference to be exactly a

24  quarter inch then at all times?

Page 101

1    A.  That's what it shows is the detail.  We know

2  that they'll never do that at all times, but that's

3  what the detail shows.

4    THE COURT REPORTER:  Excuse me, can we take a

5  quick break?

6    MS. FULCO:  Sure.

7    (Whereupon, a break was taken,

8    after which the following

9    proceedings were had:)

10  BY MS. FULCO:

11    Q.  Now, let me share my screen again.  The

12  concrete area around the curb where this incident

13  allegedly occurred, was that considered a concrete

14  gutter as referenced in this standard?

15    A.  Yep.  It's also referred to as an apron

16  sometimes.  It's where the water flows typically.

17    Q.  I just wanted to make sure because what you

18  have here says gutter.  So you also cite to a few

19  sections of the ASTM in this industry standard

20  section, correct?

21    A.  That's right.

22    Q.  And that – therefore, that is, again, just

23  an industry standard and not a Code, correct?

24    A.  That's correct.

DAVID  SCHROEDER
May 31, 2022

Page 102

1    Q.  And what does ASTM stand for?

2    A.  American Society of Testing Materials.  They

3  cover all sorts of things like windows, gutters, tons

4  of things.  And I think they also cover

5  non-architectural things as well.

6    Q.  Are the ASTM standards for commercial

7  properties to follow?

8    A.  It's not a Code.  It's an industry standard,

9  not a Code.

10    Q.  I didn't say it was.  I said are the ASTM

11  standards something for commercial properties to

12  follow?

13    A.  If you want a safe walking surface and you

14  are in the architectural industry, you would follow

15  those standards regardless of use, commercial,

16  institutional, public parks, residential.  The

17  standards are related to how people walk and how they

18  perceive things and that's it so it would apply to all

19  of those conditions.

20    Q.  And because it's an industry standard and not

21  a Code, there are no regulatory groups that are

22  finding or citing anyone for violating it, correct?

23    A.  That's correct.

24    Q.  How is it determined which industries are

Page 103

1  recommended to follow ASTM or is it really just

2  whoever wants to?

3    A.  It's whoever wants to follow it, but it's an

4  industry standard in the architectural field and

5  failure to follow industry standards or comply with

6  industry standards is something that is frowned upon

7  heavily by the architectural profession.

8    Q.  So ASTM standards are something that

9  architects follow when they are designing a building?

10    A.  Yeah.

11    Q.  The ASTM standards that you reference here,

12  those are standards that were in effect when?

13    A.  These date back to 2013.  They may have

14  adopted some newer ones.  I have some older ones as

15  well.  But if they have a new one, I haven't bought it

16  yet.

17    Q.  Okay, I'm not -- you just gave me a lot of

18  information.  I have a very specific question.

19        The ones that you are citing to in your

20  report, they went into effect when?

21    A.  These were just published in 2013.

22    Q.  And so that is when they first went into

23  effect?

24    A.  Those were published in 2013 and they were

Page 104

1  placed -- some earlier editions of them that the ASTM

2  committee meets every once in a while and they monkey

3  around with the language a little bit, add and

4  subtract if they feel it's necessary.

5    Q.  Do you know when the parking lot was first

6  constructed?

7    A.  No.

8    Q.  Do you know if there was any repaving of the

9  parking lot since it was first constructed prior to

10  the incident?

11    A.  I know there were repairs.  I don't know if

12  there was any paving.

13    Q.  If the parking lot was constructed and prior

14  to 2013 the standards you cited, the specific ones you

15  cited would not apply, correct?

16    A.  Yeah, but there are earlier ones to that it

17  would replace, so it would have the same thing.

18    Q.  I think you stated earlier -- I just want to

19  confirm, these ASTM standards that you site here in

20  this section, do these apply to indoor services,

21  outdoor services or both?

22    A.  Well, the one that I cite specifically are

23  related to exterior walkways without the exterior --

24  well, there's general, which applies to everything and

Page 105

1  then the 5.7 applies to exterior walkways in

2  particular.

3    Q.  Okay.  Is walkway defined in ASTM?

4    A.  No, not that I'm aware of.  They just talk

5  about it.  It's understood that a walking surface is a

6  place where people walk and that would include a

7  parking lot because they also include sections on here

8  which include, like I said, speed bumps, which not

9  really -- and wheel stops for cars.

10    Q.  The entire parking lot considering a walkway

11  under ASTM?

12    A.  Yeah, if you would walk there, it would be a

13  walking surface, yes.

14    Q.  No, I didn't say a walking surface.  I said a

15  walkway.  I'm asking for a definition of walkway, not

16  a walking surface.  I understand a walking surface, so

17  let me ask my question again --

18    A.  Hold on one second --

19    Q.  Wait, I want to ask my question again.

20    A.  Okay.

21    Q.  Is an entire parking lot considering a

22  walkway under ASTM?

23    A.  Yes.

24    Q.  Are you stating then that the plaintiff's

DAVID SCHROEDER
May 31, 2022

Page 106

1 incident occurred on a walkway?
2 A. Yes.
3 Q. What is your basis for that?
4 A. I'll have to open up the standard. Hold on.
5 Q. If you're going to look at something other
6 than what you have cited and even if you let me know
7 and then even if you're talking about something you've
8 cited, I need to know what section of the standard
9 you're referring to?
10 A. Yeah, I know I have to open it up. I am
11 going to bring up something and put it on my screen if
12 that's possible.
13 Q. No, I want you to first tell me what you're
14 looking at.
15 A. Okay. So the ASTM standard, the F1637-13
16 doesn't bother to provide the definitions in that
17 particular document. They replaced – and I have an
18 earlier document that goes and provides all of the
19 definitions for all of what these things are and that
20 definition for walkway is included in Section 3.1.14.
21 Q. Wait, go a little slower. So you're saying
22 ASTM 3.1. –
23 A. .14 so –
24 Q. And it's of which version?

Page 107

1 A. The 2000 – I'm sorry the 1995 standard, same
2 designation, the ASTM 1637 standard practice for safe
3 walking surfaces was kind enough to provide the
4 definitions for their terms, the terminology, which
5 for some reason 13 version of it they decided to drop
6 the terminology. I'm assuming because they put it
7 somewhere else, but I don't know. They decided to
8 drop the definition section. But the earlier version
9 has the definitions for all of what these things mean,
10 what slip resistant means, what sidewalk means, what
11 planer means, what walkway means. So if you would
12 like, I can share the screen of what the terminology
13 for the standard is.
14 Q. No, why don't you read it. I don't have it
15 as an exhibit. That wasn't given to us, so why don't
16 you read what it says for walkway?
17 A. Sure. This was from the 1995 ASTM standard
18 and this is under the terminology section of the
19 standard, which is Section 3, terminology and
20 section – or 3.1.14, walkway is defined as walking
21 surfaces constructed for pedestrian usage including
22 floors, ramps, walks, sidewalks, stair treads, parking
23 lots and similar paved areas which may be reasonably
24 foreseeable as pedestrian paths. Natural surfaces

Page 108

1 such as field, playing fields, path, walks or foot
2 paths or a combination thereof are not included.
3 Q. Now, do you know if these definitions or
4 terminologies continued into the later versions of the
5 ASTM?
6 A. Almost for sure, but I have not purchased
7 that ASTM standard which includes the definitions.
8 Q. Can you define the word flush, because that
9 is referred to in here?
10 A. Yep. Flat, level –
11 Q. And that is based on – I'm sorry.
12 A. Flush would mean that the – I'm sorry,
13 planer would mean level. Flush means that the edges
14 align with each other, so it would be possible – so
15 flush is in the same plane (indicating).
16 Q. And this is based on what?
17 A. The use of the term flush in architecture
18 would be flush. It's like – it's not like you're
19 getting red in the face.
20 Q. No, it sounded like you were reading
21 something so I'm trying to determine what you're
22 reading from –
23 A. I'm not reading from anything.
24 Q. So is it your opinion that every outdoor

Page 109

1 walkway must be flush or it's in violation of this
2 industry standard?
3 A. Yes, unless it has it needs to be flush or it
4 needs to have stairs or ramps that are Code compliant
5 for it to be in compliance with this standard.
6 Q. Is it your opinion that as soon as there is
7 any raising or depression or unevenness of pavement of
8 any kind, the industry standard is to have that area
9 repaired?
10 A. We would have to look at – it has to be
11 within a reasonable what would be considered
12 reasonable. So, you know, if the pavement is
13 broken – let's look at their definition they have or
14 what The Code or – I'm sorry, what the standard says
15 under 5.7.1.2 it says, exterior walkway conditions
16 that may be considered substandard and may need
17 repairing include conditions in which the pavement is
18 broken, depressed, raised, undermined, slippery,
19 uneven or cracked to the extent the pieces are readily
20 removed, they indicate that those conditions bear a
21 consideration of needing repair. That is all they
22 say.
23 Q. I'm asking for your opinion. Let me ask my
24 question again. Is it your opinion that once there is

DAVID  SCHROEDER
May 31, 2022

Page 110

1 any raising or depression or unevenness of pavement of
2 any kind the industry standard is to have that area
3 repaired?
4    A. No, not of any kind, that would be
5 ridiculous. You could have something be raised by,
6 you know, a 64th of an inch and nobody would even
7 notice it. The issue is when we have areas where it's
8 a large enough defect like this where if you step on
9 it, you could twist and ankle and break it or you
10 could trip and sustain injury. If it's so small that
11 your foot can't – isn't impacted or your ankle is not
12 impacted by it or it's not creating any discernible
13 puddling where ice would collect there, then it's not
14 an issue of course not, of course you're allowed to
15 have some small depressions or some small changes in
16 level or some cracks that are hairline. It's when
17 these cracks become large enough that ice forms in
18 there and creates a slipping hazard or the cracks are
19 so large as you're walking in it, a person's heel
20 could get stuck in it. That's when it become
21 hazardous. So of course not, of course you can have
22 hairline cracks and not be in violation of the
23 standard. Of course you can have a depression that is
24 small enough that it doesn't create a pool of water,

Page 111

1 you know, there is a variation in the surface of the
2 walking surface which allows it to be slip resistant.
3 Of course if you have some changes, it's fine. But
4 when it becomes hazardous and you step on it and your
5 ankle is tested and you fall and get hurt, that's a
6 problem.
7    Q. Is it your opinion that once there is raising
8 or depression or unevenness of pavement that is over a
9 quarter of an inch, unbeveled, not beveled, that the
10 industry standard is to have that area repaired?
11    A. Yes, that is actually the standard refers to
12 it and so do the codes so that would be the case.
13    Q. And it's your opinion that standard applies
14 to all businesses and retailers in Illinois?
15    A. That is standard would apply to all
16 businesses and retail stores anywhere as far as – any
17 place where people walk it applies.
18    Q. Just to clarify, that means that standard
19 applies to all businesses and retailers in Illinois
20 and throughout the country?
21    A. Yeah, it would. I mean, this is just an
22 industry standard. It's not Code, but it's a
23 standard, yes.
24    Q. Now, the last standard you cite in your

Page 112

1 report was this staircase study, correct?
2    A. Yeah.
3    Q. And that, again –
4    A. It's a book, yeah.
5    Q. And that is an industry standard. It is not
6 Code, correct?
7    A. That's correct.
8    Q. Is it your opinion that the staircase study
9 standard applies to this specific area at issue in
10 this case?
11    A. This is – once again, this is support for my
12 opinion that a small level change which is like one
13 and three-quarter inch that his studies or his
14 conclusion in his book, his textbook, is that it is
15 difficult to notice small level changes and that makes
16 it so that when there are stairs, people just don't
17 see them and they trip and fall which bolsters my
18 opinion that this one and three-quarter inch, when it
19 was measured, level change is difficult to notice.
20 Stairs are bigger than one and three-quarter inches
21 and studies show when you have a level change that's
22 seven inches, people won't notice it and they'll fall
23 right off when they're walking. They won't see it,
24 and they will step on air rather than stepping down

Page 113

1 onto the next surface below.
2    Q. Now looking at The Code section, the first
3 one you mentioned was the 2015 International Property
4 Maintenance Code. What is your basis for saying it
5 was in effect in St. Charles at the time of the
6 incident?
7    A. I reviewed the St. Charles municipal Code and
8 saw that it was – it appeared to be in effect at the
9 time of the incident.
10    Q. Wasn't the 2015 version in effect at that
11 time?
12    A. That's my understanding.
13    Q. Was it in effect when the building was built?
14    A. I don't know what Property Maintenance Code
15 if any property maintenance code were in effect at
16 the time of the construction. The Property
17 Maintenance Code is a different set of codes and they
18 govern what existing buildings need to or buildings
19 regardless of when they're built need to do where as
20 the building Code only refers to new construction or
21 only regulates new construction. So starting –
22 starting – if you're picking up your hammer, the
23 building codes tells you what you need to do if you're
24 looking at your stair, the Property Maintenance Code

DAVID   SCHROEDER
May 31, 2022

Page 114

1   tells you what you need to do.
2       Q.  Is the 2015 International Property
3   Maintenance Code mandated law for commercial
4   properties to follow?
5       A.  In this jurisdiction, yes, St. Charles
6   required compliance with the Property Maintenance
7   Code.
8       Q.  If a retail business does not comply with the
9   2015 Internation Property Maintenance Code and they
10  are in St. Charles, is there a regulatory group that
11  will find out and are able to find or cite the
12  business in any way?
13      A.  Most jurisdiction – and I'm not looking at
14  St. Charles – do have some inspectors who will review
15  properties and then if they find an issue, they will
16  provide a citation for business.  Most of those
17  inspection regimes that I have experienced almost only
18  show up to construction projects that are ongoing or
19  show up when someone has called an made a complaint.
20  So, presumably, St. Charles has a team of building
21  inspectors or some building inspectors who will
22  inspect properties for defects.
23      Q.  And whether or not St. Charles, their group
24  who look into this Code, whether or not they only go

Page 115

1   out with complaints and construction projects, have
2   you ever looked into that?
3       A.  No, I have not.
4       Q.  So this Code applies to every house and
5   business – residence and business, correct?
6       A.  Yeah, according to The Code under the scope
7   section applies to existing residential
8   non-residential structures and all the premises, yes.
9       Q.  Is the term hazardous conditions defined
10  anywhere in The Code?
11      A.  I do not recall if it is or if it is not.
12      Q.  If it's not, who would determine and decide
13  what is considered a hazardous condition?
14      A.  Typically The Code official themselves if
15  they are reviewing to determine whether or not they
16  apply a citation, they would be the Code officials' –
17  they would be the ones to make that determination.
18      Q.  So if the City sees that a property is not
19  complying with this Code you said is typically what
20  would happen is there would be a fine?
21      A.  There would be a citation if there was a
22  concern on the part of an inspector who has examined a
23  portion of the property.  Typically there would be a
24  citation as a result of their inspection and that

Page 116

1   would go to the business.
2       Q.  Did the City of St. Charles ever cite this
3   Costco for ever violating this Code at that time?
4       A.  I don't have any opinion about that or any
5   knowledge of that one way or the other.
6       Q.  Did you do any research to look into that?
7       A.  No.
8       Q.  You also cited the 2000 NFPA Life safety
9   Code, correct?
10      A.  Yes.
11      Q.  And that is a mandated Code or law for
12  commercial properties to follow; is that right?
13      A.  At the time of the accident it was a
14  requirement that the building comply with the City of
15  St. Charles, yes.
16      Q.  And would the 2000 Code be one that would
17  apply to the building even if it was a business that
18  already existed?  Is this kind of one of those that
19  apply – does it apply to the existing building or
20  only applies when it's built?
21      A.  The sections that I cite in my report apply
22  to existing buildings.  They don't bring up any Code
23  provisions that are requirements, just the ones that
24  apply to this particular building at the time of the

Page 117

1   accident.
2       Q.  So who is the regulatory group that would
3   check on a commercial property to determine if the
4   2000 NFP Life Safety Code was not being complied with?
5       A.  That was the State fire marshall's office and
6   the last time I spoke with them about this, they had
7   two inspectors for the entirety of Cook County and
8   fewer in other places, so every single building in
9   Cook County would be under their jurisdiction, the two
10  inspectors.
11      Q.  Was this store in Cook County?
12      A.  No, there are fewer in other offices than
13  Cook County so there might have been one inspector.
14      Q.  And is there – who determines if a
15  commercial property is to follow the 2000 NFPA
16  Lifestyle Code, is it the City or who makes that –
17      A.  You mean the Life Safety Code?
18      Q.  Yeah, I don't know why I keep saying the
19  wrong one, sorry.
20      A.  I'm sure I would fail the Lifestyle Code; I
21  would not be in compliance with that one.
22      Q.  Who determines which – that Code is
23  something that has to be complied with by businesses
24  in a certain area?  Is that something that is done by

DAVID   SCHROEDER
May 31, 2022

Page 118

1   the local city or is it state or who is making that
2   decision?
3      A.  Yeah, so the NFPA Life Safety Code, I believe
4   I included in my list of references, a fact sheet from
5   the State fire marshall's office.  Did you guys get
6   that or did you get that?
7      Q.  I think so.
8      A.  Okay.  So that fact sheet indicates which law
9   was adopted that gave them the jurisdiction, and I
10   don't have it in front of me but my recollection it
11   was the Fire Investigation Act that granted the
12   authority to the State fire marshall's office.
13      Q.  So is that -- is that document then that's
14   your basis to say that the 2000 NFPA Code applied to
15   the Costco Warehouse parking lot in February 2019?
16      A.  Was it the document the fact sheet on what is
17   the State Fire Code on April 2013?
18      Q.  No.  My question is, what is your basis to
19   say that the 2000 NFPA Code applied to the Costco
20   Warehouse parking lot in February of 2019?
21      A.  What is the basis?  Well there is the fact
22   sheet on what is the state fire Code that was
23   published in 2013 from the Office of the Illinois
24   State Fire Marshall's Office, which stated that it

Page 119

1   applied to -- it was applicable throughout the state
2   and applies to all occupied buildings with the
3   exception of Illinois public schools that fall under
4   the codes and rules of the Illinois State Board of
5   Education, which also stated that it would have been
6   applicable in even in committees.
7      So there is that document that I relied upon.
8   And then in addition to that I received's bulletin
9   about a year or two ago which indicated that starting
10   on January 1, 2020, the -- due to a new law signed
11   into effect by the Governor Pritzker that the NFPA
12   Life Safety Code would not longer apply to communities
13   with home rule and whatever fire Code they adopt,
14   assuming that they adopted a fire Code, that that
15   would take The Code that we need to follow.  So up
16   until January 1st of 2020, based on the information I
17   received as an architect, it did apply.  But as of
18   January 1, 2020 it would go to whatever St. Charles
19   adopted with respect to fire codes.
20      Q.  Was this St. Charles Costco cited for
21   violating any aspect of the 2000 NFPA Life Safety Code
22   for the parking lot before this incident?
23      A.  Not that I'm aware of one way or another.  I
24   don't have any opinion or knowledge about that.

Page 120

1      Q.  Did you look into that at all?
2      A.  No.
3      Q.  Section 7.1.1 indicates means of egress for
4   buildings, correct?
5      A.  That's correct.
6      Q.  And the NFPA is the National Fire Protection
7   Association's code, correct?
8      A.  Correct.
9      Q.  When the NFPA refers to a means of egress,
10   it's referring to in and out of the building, correct?
11      A.  Yeah, it's anywhere inside the building to
12   the public way, which is basically public property
13   such as the sidewalk or the public road public alley.
14      Q.  Anywhere in the NFPA Code does it state it's
15   referring to just an open asphalt parking lot?
16      A.  No, they don't specifically differentiate
17   between -- when they talk about means of egress, they
18   don't talk about parking lots.  They would refer to it
19   as the exit discharge area, which is the area between
20   the exit, which is the door out of the building in the
21   public way, which is defined as the one that is
22   permanently appropriated and deeded for the public
23   use, and I can get you those Code definitions if you
24   need them.

Page 121

1      Q.  As an architect when you refer to an area as
2   a means of egress, what are you referring to?
3      A.  The means of egress is, once again, a path
4   from anywhere path from anywhere inside the
5   building to the public way and so from my perspective
6   a person who is using the building would be walking --
7   if they were walking to their car, for example, and
8   there was some big emergency like an explosion, what
9   is the path they would take to the public way from the
10   parking spot, they would drive or they'd walk over to
11   the public sidewalk, so that pathway would be included
12   as part of the means of egress in my opinion.
13      Q.  What is the basis of that opinion?
14      A.  My experience and training as an architect
15   and the definition of the exit discharge, which is the
16   space between the exit and the public way.
17      Q.  Is it your position in this case that the
18   entire parking lot at Costco is a means of egress
19   according to the NFPA Code?
20      A.  I would say so, yes.
21      Q.  And what section of The Code supports that
22   position?
23      A.  The definition of the means of egress which
24   includes the exit -- the exit discharge definition.

DAVID SCHROEDER
May 31, 2022

Page 122

1    Q. At the bottom of The Code section under
2  7.1.6.3 what is considered a level surface?
3    A. It just indicates what is considered
4  nominally level. That means by nominally it means
5  that –
6    Q. No, I'm not asking what a nominally level is.
7  I'm saying what is considered a level surface?
8    A. I'm getting there. If you would not
9  interrupt me, I would get there. They tell you that
10  the walkway surface should be nominally level, that
11  means that you really can't measure the slope. So
12  it's – an abrupt change of level is 100 percent
13  slope. So the slope of a walking surface and the
14  direction of travel should not exceed one and 20. So
15  basically it's got to be flat. That is all it means.
16    Q. So you're saying a level surface means it's
17  flat?
18    A. Yeah, nominally level, it's got to be – not
19  exceed 1 and 20, that's a 5-percent slope, so, yeah,
20  it would be more than a 5-percent slope.
21    Q. So going back to the opinion section of your
22  report looking at opinion number five, have you seen
23  any photographs of the incident area taken prior to
24  the plaintiff's alleged fall?

Page 123

1    A. No, I have not.
2    Q. All of the photographs that you have seen
3  were from the day of her incident or later, correct?
4    A. That's correct.
5    Q. How long since the pavement that was there at
6  the time of the fall was put down?
7    A. Excuse me? Can you please repeat the
8  question? I didn't hear that.
9    Q. The pavement that was there at the time of
10  the incident, how long had that pavement been there
11  prior to her fall?
12    A. I don't know.
13    Q. The height difference between the asphalt and
14  cement could have changed and fluctuated with the
15  weather over the years, correct?
16    A. Yes.
17    Q. Did you inspect the parking lot in the area
18  of the fall during the months or years before the
19  incident?
20    A. No.
21    Q. Is that a store that you had ever been to,
22  you know, personally or professionally?
23    A. No.
24    Q. So what is the basis – what basis do you

Page 124

1  have for saying that the height difference and giving
2  a height difference for that area a year before the
3  incident?
4    A. That is based on my experience that these
5  level changes don't occur overnight, and it takes
6  years usually. Most settlement, if it's an issue with
7  compaction, occurs within the first year and then
8  after that it can only get worse. But it's not
9  something that I have ever experienced professionally
10  where you had a level change that appeared over the
11  course of even one year. It's usually several years
12  before they really start a change.
13    Q. Do you have any basis for that opinion other
14  than your personal experience?
15    A. My professional experience not my personal
16  experience. My professional experience and my
17  training as an architect.
18    Q. Do you have any other basis?
19    A. No.
20    Q. Looking at opinion number six, the only
21  information you have about Rose Paving is the contract
22  and the invoices, some invoices, correct?
23    A. That's correct.
24    Q. You have not seen any deposition testimony

Page 125

1  about the relationship between Costco and Rose or what
2  type of work Rose did, correct?
3    A. That's correct.
4    Q. When was the last time the area at issue was
5  paved?
6    A. It's not clear to me based on what I have
7  read or reviewed, I don't know.
8    Q. Do you know what the actual height difference
9  was between the pavement and the cement curb in the
10  area of the fall when the area was last paved before
11  the fall?
12    A. No.
13    Q. Looking at the second line of opinion six,
14  can you explain what that is referring to, the second
15  small dot?
16    A. Sure. You know, in all of the photographs
17  that I have seen and all of the measurements, you
18  know, we've got measurement one, which shows it's
19  approximately a 1-inch level change. We've got
20  photographs that show what appears to be a larger
21  level change in the winter than in the summer. But
22  regardless of when and if – whatever the measurements
23  are, if Rose Paving made a repair in the area where
24  this accident took place that resulted in a level

DAVID SCHROEDER
May 31, 2022

Page 126

1 change of 1 inch or one-and-three-quarter inch or
2 anything in excess of a quarter inch should have been
3 rejected and that's what my opinion is for there and
4 not accepted by Costco.
5     Q. Do you know if that is something that
6 occurred?
7     A. No, I do not know if that occurred or not.
8 This is just my opinion is that if that occurred, then
9 it was – then Costco would have known about it if –
10 if Rose Paving installed this, they would have
11 presumably reviewed it and then paid for it or they
12 wouldn't have paid for it based on the results of
13 their work.
14     Q. And your position based on – tell me if this
15 is correct based on your report:
16       Your position is because a paving company was
17 hired to do the work, that means Costco was aware of a
18 problem in the parking lot; is that correct?
19     A. That's correct. If they had reviewed their
20 parking lot and assessed – they had spent time
21 assessing their parking lot to the place where they
22 realized that – they assessed it enough to know that
23 the parking lot was in need of repairs, which to me
24 means that if their assessment were thorough, they

Page 127

1 would have also included the area where plaintiff fell
2 to be a part of the repairs as well.
3     Q. And is that is assuming there were problems
4 in that area but you have no basis for that because
5 you can see no pictures, you read no deposition
6 testimony –
7     MR. HIRSCH: I'll just object –
8     THE WITNESS: My opinion was that there
9 was – that this was a long-term problem that existed
10 at least a year prior to the accident and that it
11 would have been in place, that is my opinion.
12 BY MS. FULCO:
13     Q. Again, that's based only on your professional
14 experience, correct?
15     A. That is based on my experience and training
16 as an architect, that's correct.
17     Q. You would agree it's common practice for
18 residential and commercial properties that have
19 pavement or asphalt to do repaving on occasion,
20 correct?
21     A. Yeah, for sure.
22     Q. You state the area at issue should have been
23 included in the repairs done five months prior to the
24 incident; is that correct?

Page 128

1     A. That's correct.
2     Q. You're assuming the height difference was
3 such that it required repair at that time, correct?
4     A. That's correct. That's not assuming. Based
5 on my experience and training it would have been at
6 issue for at least a prior to the accident.
7     Q. And you have given us your basis as to that,
8 correct?
9     A. It's my experience and my job to pay
10 attention to these things and know these things.
11     Q. Now, opinion number seven, you were actually
12 told that the change in level caused the plaintiff to
13 fall when you were hired by Counsel and that's what he
14 put in the e-mail to you, correct?
15     A. He did. But he also sent me the client who
16 stated that he told me that that is what she had told
17 him.
18     Q. You're basis that it was an architectural
19 defect is because it was a height difference of more
20 than a quarter inch, correct?
21     A. That's correct.
22     Q. Can a person exit their car and fall by
23 tripping on a curb?
24     A. Yes.

Page 129

1     Q. Do you know how tall the curb was next to the
2 plaintiff's car?
3     A. Approximately 6 inches, but I have not
4 measured it.
5     Q. Why is that – based on all of these
6 standards and codes that you have told me about, why
7 is a curb not an architectural defect?
8     A. Because it's in a traditional – it's
9 where – once again, as it is stated in the staircase
10 which I cited and quoted it says that single steps
11 should not be built accept at thresholds, curbs and
12 other places where they are customarily found. So a
13 curb is customarily – includes a level change and it
14 is a requirement in order to prevent or to allow for
15 draining. And it also prevents wheels – or cars from
16 driving onto landscaped areas and allows for place to
17 water to flow. It is something that we do in the
18 United States and do around the world so people expect
19 it because it's customary.
20     Q. Can a person get out of their car and just
21 misstep causing them to lose their balance and fall?
22     A. Sure.
23     Q. Could a person get out of their car and there
24 be a rock there and they misstep and they lose their

DAVID SCHROEDER
May 31, 2022

Page 130

1  balance and fall?
2      A. Sure.
3      Q. If weather conditions caused ground surfaces
4  to shift so there is a height difference between two
5  surfaces in a parking lot, like between the asphalt
6  and the concrete, in your opinion how long does the
7  property owner have to fix that situation?
8      MR. HIRSCH: Just object, incomplete
9  hypothetical. What kind of height difference are we
10  talking about?
11     MR. FULCO: You can answer.
12     THE WITNESS: How long if you find a defect
13  like this? If you were to discover it in the winter,
14  you can't repair it in the winter. But you would
15  have – in my opinion, you would need to fix it the
16  next time when there is a thaw. But, once again, my
17  opinion is the height differential even in the summer
18  is excessive so – and it would have been there prior
19  to the accident for at least a year, so they should
20  have fixed it at least the summer before, and it's
21  more likely much older than that but I feel confident
22  saying it was there at least a year.
23     Q. Would that be for any difference in height
24  over a quarter of an inch that – so, actually, let's

Page 131

1  break that down.
2      So let's say it's anything over a quarter of
3  an inch, how long does the property owner have to get
4  it fixed?
5      A. Until the next freeze-thaw, you know.
6      Q. And does that apply to commercial and
7  residential properties?
8      A. Yep – to be clear, yes.
9      MS. FULCO: That's all I've got. Thank you.
10     THE WITNESS: Sure.
11         EXAMINATION
12  BY MR. HIRSCH:
13     Q. Just going back over that there is a height
14  defect, you said that they can't – permanent – well,
15  you can't repair it in the winter. Does that mean you
16  can permanently repair it in the winter?
17     A. Yeah, the issue is that if the ground is
18  frozen, first off, you can't really – I mean, you
19  could do a temporary fix. You could put down a patch
20  in the gutter of the concrete to keep it from – to
21  get rid of that level change. But it's not – but a
22  permanent fix requires digging up the asphalt,
23  potentially, making sure that there's gravel
24  underneath there. If there is no gravel, putting in

Page 132

1  gravel, tamping it down and laying the asphalt.
2  Asphalt does not like to go down in the winter.
3      Q. What would a temporary repair consist of?
4      A. You know, if you've ever seen – it would be
5  this patch. You can see it sometimes on – it's like
6  an asphalt patch that you could put on top of the
7  concrete gutter to make it more level. Or a concrete
8  patch. It would just be there for the remainder of
9  the winter.
10     Q. Is that something that is relatively
11  inexpensive?
12     A. Yeah, it's not a very expensive product.
13     Q. Or they could just put an orange cone on that
14  spot to make people aware to avoid it?
15     A. Yeah, they could close that spot.
16     Q. Going back to your opinion – the opinion
17  number five, which is that this height differential if
18  it wasn't put in by Rose Paving, based on your
19  professional experience and training as an architect
20  and, obviously, it's also based on your review of the
21  photographs; is that true?
22     A. Yes.
23     Q. That kind of level change takes at least
24  a year or more; is that fair?

Page 133

1      A. Yes.
2      Q. And can you explain kind of how that level
3  change would take over a year to come about?
4      A. Sure. So as I sort of went over this, there
5  is a decent chance that this thing was installed –
6  that the asphalt surface and the concrete surface –
7  we are talking the horizontals that we are seeing –
8  there is a decent chance they were never installed –
9  they were never installed flush. That would mean
10  that this was preset for – as long as that parking
11  lot had been present, this thing had been present. So
12  there is a really good chance that is the case.
13     If this thing had been installed flush and it
14  has heaved, what that means is – so it would have
15  been installed in the summertime or in the fall or the
16  spring, and it would require there to be freeze –
17  freezing underneath the asphalt slab, which would then
18  raise it. And then when it comes down to settlement,
19  it usually settles a little bit less than it raises in
20  the winter. And for it to – if it was installed
21  flush to begin with or a quarter inch per the Illinois
22  Department of Transportation standard detail, it would
23  have had to heave, at the very least, three quarter
24  inches above where it was and stayed there, and that

DAVID  SCHROEDER
May 31, 2022

Page 134

1  would take time to get up to that height.  It wouldn't
2  just be that winter unless it goes up – unless it had
3  been present only for one – only since the summer,
4  and based on the photographs it looks like pretty old
5  asphalt.  So it would have taken place over time
6  whether there is a freeze-thaw and it goes up a little
7  higher every year and then settles down, but it would
8  take a while.
9      Q.  And then going back to the 2000 NFPA Life
10  Safety Code, your opinion is that that Code applied
11  here and can you explain why it's – even though the
12  accident happened in February of 2019, why the 2000
13  NFPA Life Safety Code – how that applies?
14      A.  Sure.  So the State of Illinois adopted the
15  NFPA Life Safety Code from 2000, and that they adopted
16  it quite a long time ago.  And they made it – made
17  all of the buildings comply with that Code.  And so
18  they never updated it.  There was actually an attempt
19  to update it about four years ago to a later version
20  which would have required sprinklers be installed in
21  high rises and building owners throughout the state
22  had a collective freak out and the state fire
23  marshall's office, with some pressure from the various
24  political – politicians who represent these districts

Page 135

1  said, no way, you're going to have to leave it as the
2  2000 version of the NFPA Life Safety Code because
3  nobody has the money to retrofit all of those old
4  skyscrapers so that is why it's 2000.  They adopted
5  that one way back when and there has been strong
6  pushback to adopt later versions.
7      Q.  And the 2015 International Property
8  Maintenance Code that applies in this case applies not
9  just to existing buildings and structures but to the
10  existing entire premises including the parking lot; is
11  that fair?
12      A.  That's correct.  It includes – that's why it
13  includes in there – in the provisions it talks about
14  sidewalks and driveways and some parking spaces in
15  similar areas.  It covers the entire property.  It
16  also has sections on trash and water – not having
17  stagnant water, things like that.
18      Q.  And going back earlier in the deposition you
19  were asked about a bird's-eye-view photograph of the
20  parking lot that had a lot of writing on it including
21  the letter A where the cart corral was and the B,
22  where it says I was parked in B, and that was provided
23  along with some photographs.  It was all provided
24  along with Cynthia Costanzo's written statement; is

Page 136

1  that fair?
2      A.  I believe it was in the same e-mail, but I
3  can't remember exactly if it was in the same e-mail or
4  if it was part of the same package or if it was two
5  packages.  I just don't remember.
6      Q.  And in her statement the second sentence of
7  her statement she writes I parked in the parking lot
8  in a spot identified on the attached photographs?
9      MS. FULCO:  I'm going to state, again, any
10  objection over that statement as to whether she said
11  it, it goes to my prior objection about that exhibit,
12  so that is a standing objection.
13      THE WITNESS:  What was the question?
14  BY MR. HIRSCH:
15      Q.  Sure.  The document that you reviewed
16  entitled statement of Cynthia Costanzo with her
17  signature at the bottom –
18      A.  Yes.
19      Q.  – the second sentence reads:  I parked in
20  the parking lot in a spot identified on the attached
21  photographs?
22      A.  Yes.
23      Q.  And part of the attached photographs would
24  have included that photograph with the writing on it?

Page 137

1      A.  That's correct, yeah.  I'm looking at the
2  e-mail attachment.  It includes her statement and the
3  Costanzo overview and then photos from the defense and
4  photos from the plaintiff.  And all of those things
5  together allowed me to determine where she fell.
6      MS. FULCO:  Just for the record, same
7  objection.
8  BY MR. HIRSCH:
9      Q.  All right.  And so then you're aware based on
10  her statement and the photographs that she had pulled
11  into the spot, opened the door and got out of the car
12  and stepped on that uneven surface?
13      MS. FULCO:  Same objection.
14      THE WITNESS:  Yeah, that's what she said.
15  She spoke – or she stepped on the joint between the
16  asphalt and the concrete.
17  BY MR. HIRSH:
18      Q.  She states that part of her foot was on the
19  asphalt and part was on the concrete?
20      A.  Yes.
21      MR. FULCO:  Same objection.
22  BY MR. HIRSCH:
23      Q.  And she describes that she used – her and
24  her husband had returned to the place of the accident

DAVID   SCHROEDER
May 31, 2022

Page 138

1   about three to four weeks afterwards; is that fair?
2       MS. FULCO: Same objection --
3       THE WITNESS: That's right.
4   BY MR. HIRSCH:
5       Q.  And that they used her husband's cowboy
6   boots, they also took a picture of, with the
7   husband's heel up against the asphalt, with the place
8   that caused her to fall?
9       MR. FULCO: Same objection.
10      THE WITNESS: That's right.
11  BY MR. HIRSCH:
12      Q.  And then they measured the heel to determine
13  the height difference of the area that caused her to
14  fall?
15      A.  That's right.
16      MS. FULCO: Same objection.
17  BY MS. FULCO:
18      Q.  And that is how you determined that it was
19  one and three-quarters of an inch height differential?
20      A.  That's right.
21      MS. FULCO: Same objection.
22  BY MR. HIRSCH:
23      Q.  And then another person came out and measured
24  various areas.  You have the report of the different

Page 139

1   heights that were measured for this other person; is
2   that fair?
3       A.  Yes.
4       Q.  And even if this other person -- even if they
5   measured one inch or the one-and-a-half inch, your
6   opinions are still the same?
7       A.  That's correct.
8       Q.  And all of your opinions are to a reasonable
9   degree of architectural and physical certainty?
10      A.  Yes.
11      Q.  And they are based on your training,
12  experience and knowledge as a professional architect
13  for at least 20 years?
14      A.  Yes.
15      Q.  As part of your professional work, you deal
16  with some of the industry standards that you have
17  discussed today?
18      A.  Yes.
19      Q.  And same thing with the codes that you have
20  discussed today?
21      A.  Yes.
22      Q.  And the staircase book that you discussed
23  today?
24      A.  Yes.

Page 140

1       Q.  And you applied those in your own work to
2   make sure that walking safe surfaces are safe for
3   pedestrians?
4       A.  Yes.
5       Q.  And that includes indoors and outdoors?
6       A.  Yes.
7       Q.  And so your opinions in this case are based
8   on -- and you already went through everything that you
9   reviewed in this case and are all the things that you
10  have reviewed in this case -- did you -- would you say
11  that you have reasonably relied upon all of these
12  documents and photographs in coming to your opinion?
13      A.  Yes.
14      Q.  One of your -- I just want to go through your
15  opinions.  Your first opinion in this case is that
16  parking lots need to be able to safely accommodate the
17  movement of cars, bicycles and pedestrians; is that
18  your opinion?
19      A.  Yes.
20      Q.  They also must be able to accommodate the
21  safe transition into and out of vehicles?
22      A.  Yes.
23      Q.  All right.  And in this case, this particular
24  parking lot with that height difference, it did not

Page 141

1   safely accommodate a pedestrian into or out of her
2   vehicle in this matter?
3       A.  No, it was unsafe.  It was an unsafe
4   transition to get into and out of the car because of
5   that level changes.
6       Q.  That is based on your training and experience
7   and your ASTM industry standard?
8       A.  Yes, as well as the NFPA Life Safety Code and
9   the Property Maintenance Code.
10      Q.  All right.  And this abrupt level change,
11  whether it's an inch or an inch and a half or an inch
12  and three quarters between the concrete gutter and
13  asphalt parking surface was unreasonably hazardous?
14      A.  Yes.
15      Q.  It's a tripping hazard?
16      A.  Yes.
17      Q.  As you discussed earlier, The Code provisions
18  that you site to limit the change to a quarter of an
19  inch unbeveled?
20      A.  That's correct.
21      Q.  And it's a half inch if it's beveled?
22      A.  That's correct.  It's a pretty -- the bevel
23  is one vertical, two horizontal, so it's a pretty
24  shallow bevel for that.

DAVID SCHROEDER
May 31, 2022

Page 142

1    Q. In lay terms, the definition of bevel is kind
2  of like an incline or a ramp?
3    A. Yeah, like a slope.
4    Q. All right. And in addition the anywhere
5  between one-and-a-half to one-and-three-quarter-inch
6  height difference, it's using your citations to single
7  riser steps. It's much more difficult to notice than
8  an 18 inch or higher step?
9    A. Oh, yes, it's much harder to notice these
10  small level changes, like a single level step is
11  usually 7 inches. Between 7 – older codes allow 8,
12  so, yeah, it's a lot harder to notice the level change
13  of one-and-three-quarter-inch or one-and-a-half inches
14  or one inch than it is to notice something that's
15  7 inches and 7 inches is considered difficult to
16  notice by the industry so – and by codes.
17    Q. And the area between the asphalt and the
18  gutter apron in order to – per the industry standard,
19  if there is going to be a height change, it should be
20  a quarter of an inch?
21    A. That's right.
22    Q. Customarily, it's generally not going to be
23  much bigger than that?
24    A. No, it's not going to be bigger than that.

Page 143

1    Q. As opposed to a curb pedestrians are – they
2  know that curbs are going to be – there is going to
3  be a height difference at the actual curb is a
4  customary height difference than a pedestrian knows to
5  look for?
6    A. That's correct. People expect there to be a
7  curb, but they won't expect there to be a level change
8  between the asphalt and the concrete gutter.
9    Q. We already discussed how that abrupt level
10  change does not meet the industry standards of the
11  2020 Illinois Department of Transportation Highway and
12  the ASTF-13 and the staircase studies of hazardous
13  falls and safer design?
14    A. Yeah, it does not meet any of those
15  standards.
16    Q. It's also in violation of the 2015
17  International Property Maintenance Code and the 2000
18  NFPA Life Safety Code?
19    A. That's correct, just the sections that I
20  referred to in my report.
21    Q. All right. And based on, again, the height
22  difference being – whether it was an inch or an inch
23  and a half or an inch three-quarters, as you have
24  discussed, it likely took several years for that

Page 144

1  height difference to come about but, at least, one
2  year; is that fair?
3    A. Yes.
4    Q. In the alternative you also reviewed that
5  Rose Paving had come out about five months before the
6  fall and did some work?
7    A. Yes.
8    Q. Okay. And that if paving was part of those
9  repairs and if they had paved the section where
10  Ms. Costanzo fell, that likely Costco would have
11  reviewed their work and should have noticed that it
12  was poor poorly done work?
13    A. That's correct.
14    Q. Is it generally standard in the industry when
15  somebody contracts – for instance, have Rose Paving
16  come out and do some repair work or repave that the
17  owner of the premises or whoever is maintaining the
18  premises will review the work that is done immediately
19  after?
20    A. Yes.
21    Q. All right. And then they would have had
22  another five months to notice and remedy the height
23  difference issue?
24    A. That's correct.

Page 145

1    Q. And just the fact that they were out – Rose
2  was out there making repairs indicates that someone
3  from Costco had inspected the parking lot and should
4  have at least noticed this height difference where
5  Ms. Costanzo had fallen?
6    A. Yes, that's my opinion.
7    Q. All right. And that it's this height
8  difference that caused or contributed to cause
9  Ms. Costanzo to fall that day?
10    A. That's correct.
11    Q. And that these codes and industry standards
12  exist to prevent falls such as this one?
13    A. That's correct.
14    MR. HIRSCH: Thank you. Those are all the
15  questions that I have.
16    MR. FULCO: Just a quick follow up.
17    FURTHER EXAMINATION
18  BY MS. FULCO:
19    Q. You talked about the heaving of the asphalt
20  when there is defect. If there is no defect in the
21  asphalt, is there any change in height of asphalt with
22  temperature changes?
23    A. It's really minimal. There would not be a
24  differential change in the asphalt relative to the

DAVID SCHROEDER
May 31, 2022

## Page 146

1   concrete apron or gutter. It's a very minimal change
2   in elevation that takes place if there is not a defect
3   where water is getting in there or the gravel is not
4   compacted properly or it wasn't paved properly to
5   begin with.
6        Q.  Is that the same thing – if it's two pieces
7   of concrete cement that are next to each other, is it
8   the same issues that apply that cause heaving?
9        A.  Yes, I believe, yes.
10       Q.  And, again, you need to have some type of a
11   problem in order for heaving occur and if there was no
12   problem with the way it was installed, then there's
13   not going to be any heaving of any consequence?
14       A.  There is a minimum.  There is some heaving
15   but it's not consequential, yes.
16       MS. FULCO:  Okay, that's all I have.  That's
17   it.
18       Linda, I'll order and send you the exhibits.
19       THE COURT REPORTER:  Okay.  Mr. Hirsch, would
20   you like a copy?
21       MR. HIRSCH:  No, we don't need it right now.
22
23
24

## Page 147

1   NORTHERN DISTRICT OF ILLINOIS )
    EASTERN DIVISION            )
2   STATE OF ILLINOIS           )
                                ) SS:
3   COUNTY OF COOK              )
4        I, Linda A. Barger, Certified Shorthand
5   Reporter in and for the County of Cook, State of
6   Illinois, do hereby certify that on the 31st of May,
7   A.D., 2022, the deposition of the witness,
8   DAVID SCHROEDER, called by the Defendant, was taken
9   before me, reported stenographically and was
10  thereafter reduced to typewriting through
11  computer-aided transcription.
12       The said witness, DAVID SCHROEDER, was first
13  duly sworn to tell the truth, the whole truth, and
14  nothing but the truth, and was then examined upon oral
15  interrogatories.
16       I further certify that the foregoing is a
17  true, accurate and complete record of the questions
18  asked of and answers made by the said witness, at the
19  time and place hereinabove referred to.
20       The undersigned is not interested in the
21  within case, nor of kin or counsel to any of the
22  parties.
23       Witness my official signature in and for.
24  Cook County, Illinois on this 20th day of June, A.D.,

## Page 148

1   2022.
2
3
4
5
6        Linda A. Barger, CSR
         License No. 084-004442
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24